# COLORADO *v.* CONNELLY

No. 85–660.  Argued October 8, 1986—Decided December 10, 1986

Rehnquist, C. J., delivered the opinion of the Court, in which White, Powell, O'Connor, and Scalia, JJ., joined, and in all but Part III–A of which Blackmun, J., joined. Blackmun, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 171. Stevens, J., filed an opinion concurring in the judgment in part and dissenting in part, *post*, p. 171. Brennan, J., filed a dissenting opinion, in which Marshall, J., joined, *post*, p. 174.

*Nathan B. Coats* argued the cause for petitioner. With him on the briefs was *Norman S. Early, Jr.*

*Andrew J. Pincus* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Fried, Assistant Attorney General Trott,* and *Deputy Solicitor General Frey.*

*Thomas M. Van Cleave III* argued the cause for respondent. With him on the brief were *David F. Vela, Robin Desmond,* and *Abelardo P. Bernal.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Colorado et al. by *Duane Woodard,* Attorney General of Colorado, *Charles B. Howe,* Deputy Attorney General, *Richard H. Forman,* Solicitor General, and *Eric Perryman,* Assistant Attorney General, *Charles A. Graddick,* Attorney General of Alabama, *John Van de Kamp,* Attorney General of California, *John J. Kelly,* Chief State's Attorney of Connecticut, *Charles M. Oberly,* Attorney General of Delaware, *Jim Smith,* Attorney General of Florida, *Richard Opper,* Attorney General of Guam, *Jim Jones,* Attor-

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

In this case, the Supreme Court of Colorado held that the United States Constitution requires a court to suppress a confession when the mental state of the defendant, at the time he made the confession, interfered with his "rational intellect" and his "free will." Because this decision seemed to conflict with prior holdings of this Court, we granted certiorari. 474 U. S. 1050 (1986). We conclude that the admissibility of this kind of statement is governed by state rules of evidence, rather than by our previous decisions regarding coerced confessions and *Miranda* waivers. We therefore reverse.

---

ney General of Idaho, *Neil F. Hartigan*, Attorney General of Illinois, *Linley E. Pearson*, Attorney General of Indiana, *Thomas J. Miller*, Attorney General of Iowa, *David L. Armstrong*, Attorney General of Kentucky, *William J. Guste, Jr.*, Attorney General of Louisiana, *Frank J. Kelley*, Attorney General of Michigan, *Hubert H. Humphrey III*, Attorney General of Minnesota, *Edwin L. Pittman*, Attorney General of Mississippi, *William L. Webster*, Attorney General of Missouri, *Mike Greely*, Attorney General of Montana, *Brian McKay*, Attorney General of Nevada, *Stephen E. Merrill*, Attorney General of New Hampshire, *W. Cary Edwards*, Attorney General of New Jersey, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Michael Turpen*, Attorney General of Oklahoma, *David Frohnmayer*, Attorney General of Oregon, *Travis Medlock*, Attorney General of South Carolina, *W. J. Michael Cody*, Attorney General of Tennessee, *Jim Mattox*, Attorney General of Texas, *David L. Wilkinson*, Attorney General of Utah, *Jeffrey L. Amestoy*, Attorney General of Vermont, *Leroy A. Mercer*, Attorney General of the Virgin Islands, *Mary Sue Terry*, Attorney General of Virginia, *Kenneth O. Eikenberry*, Attorney General of Washington, and *Archie G. McClintock*, Attorney General of Wyoming; and for the American Psychological Association by *Bruce J. Ennis, Jr.*, and *Donald N. Bersoff*.

*Michael L. Perlin* filed a brief for the Coalition for the Fundamental Rights and Equality of Ex-patients as *amicus curiae* urging affirmance.

*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Jack E. Yelverton, David Crump, Daniel B. Hales*, and *William C. Summers* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae*.

I

On August 18, 1983, Officer Patrick Anderson of the Denver Police Department was in uniform, working in an off-duty capacity in downtown Denver. Respondent Francis Connelly approached Officer Anderson and, without any prompting, stated that he had murdered someone and wanted to talk about it. Anderson immediately advised respondent that he had the right to remain silent, that anything he said could be used against him in court, and that he had the right to an attorney prior to any police questioning. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Respondent stated that he understood these rights but he still wanted to talk about the murder. Understandably bewildered by this confession, Officer Anderson asked respondent several questions. Connelly denied that he had been drinking, denied that he had been taking any drugs, and stated that, in the past, he had been a patient in several mental hospitals. Officer Anderson again told Connelly that he was under no obligation to say anything. Connelly replied that it was "all right," and that he would talk to Officer Anderson because his conscience had been bothering him. To Officer Anderson, respondent appeared to understand fully the nature of his acts. Tr. 19.

Shortly thereafter, Homicide Detective Stephen Antuna arrived. Respondent was again advised of his rights, and Detective Antuna asked him "what he had on his mind." *Id.*, at 24. Respondent answered that he had come all the way from Boston to confess to the murder of Mary Ann Junta, a young girl whom he had killed in Denver sometime during November 1982. Respondent was taken to police headquarters, and a search of police records revealed that the body of an unidentified female had been found in April 1983. Respondent openly detailed his story to Detective Antuna and Sergeant Thomas Haney, and readily agreed to take the officers to the scene of the killing. Under Connelly's sole direction, the two officers and respondent pro-

ceeded in a police vehicle to the location of the crime. Respondent pointed out the exact location of the murder. Throughout this episode, Detective Antuna perceived no indication whatsoever that respondent was suffering from any kind of mental illness. *Id.*, at 33–34.

Respondent was held overnight. During an interview with the public defender's office the following morning, he became visibly disoriented. He began giving confused answers to questions, and for the first time, stated that "voices" had told him to come to Denver and that he had followed the directions of these voices in confessing. *Id.*, at 42. Respondent was sent to a state hospital for evaluation. He was initially found incompetent to assist in his own defense. By March 1984, however, the doctors evaluating respondent determined that he was competent to proceed to trial.

At a preliminary hearing, respondent moved to suppress all of his statements. Dr. Jeffrey Metzner, a psychiatrist employed by the state hospital, testified that respondent was suffering from chronic schizophrenia and was in a psychotic state at least as of August 17, 1983, the day before he confessed. Metzner's interviews with respondent revealed that respondent was following the "voice of God." This voice instructed respondent to withdraw money from the bank, to buy an airplane ticket, and to fly from Boston to Denver. When respondent arrived from Boston, God's voice became stronger and told respondent either to confess to the killing or to commit suicide. Reluctantly following the command of the voices, respondent approached Officer Anderson and confessed.

Dr. Metzner testified that, in his expert opinion, respondent was experiencing "command hallucinations." *Id.*, at 56. This condition interfered with respondent's "volitional abilities; that is, his ability to make free and rational choices." *Ibid.* Dr. Metzner further testified that Connelly's illness did not significantly impair his cognitive abilities. Thus, respondent understood the rights he had when Officer Ander-

son and Detective Antuna advised him that he need not speak. *Id.*, at 56–57. Dr. Metzner admitted that the "voices" could in reality be Connelly's interpretation of his own guilt, but explained that in his opinion, Connelly's psychosis motivated his confession.

On the basis of this evidence the Colorado trial court decided that respondent's statements must be suppressed because they were "involuntary." Relying on our decisions in *Townsend* v. *Sain*, 372 U. S. 293 (1963), and *Culombe* v. *Connecticut*, 367 U. S. 568 (1961), the court ruled that a confession is admissible only if it is a product of the defendant's rational intellect and "free will." Tr. 88. Although the court found that the police had done nothing wrong or coercive in securing respondent's confession, Connelly's illness destroyed his volition and compelled him to confess. *Id.*, at 89. The trial court also found that Connelly's mental state vitiated his attempted waiver of the right to counsel and the privilege against compulsory self-incrimination. Accordingly, respondent's initial statements and his custodial confession were suppressed. *Id.*, at 90.

The Colorado Supreme Court affirmed. 702 P. 2d 722 (1985). In that court's view, the proper test for admissibility is whether the statements are "the product of a rational intellect and a free will." *Id.*, at 728. Indeed, "the absence of police coercion or duress does not foreclose a finding of involuntariness. One's capacity for rational judgment and free choice may be overborne as much by certain forms of severe mental illness as by external pressure." *Ibid.* The court found that the very admission of the evidence in a court of law was sufficient state action to implicate the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The evidence fully supported the conclusion that respondent's initial statement was not the product of a rational intellect and a free will. The court then considered respondent's attempted waiver of his constitutional rights and found that respondent's mental condition precluded his

ability to make a valid waiver. *Id.*, at 729. The Colorado Supreme Court thus affirmed the trial court's decision to suppress all of Connelly's statements.

## II

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." Just last Term, in *Miller* v. *Fenton*, 474 U. S. 104, 109 (1985), we held that by virtue of the Due Process Clause "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." See also *Moran* v. *Burbine*, 475 U. S. 412, 432–434 (1986).

Indeed, coercive government misconduct was the catalyst for this Court's seminal confession case, *Brown* v. *Mississippi*, 297 U. S. 278 (1936). In that case, police officers extracted confessions from the accused through brutal torture. The Court had little difficulty concluding that even though the Fifth Amendment did not at that time apply to the States, the actions of the police were "revolting to the sense of justice." *Id.*, at 286. The Court has retained this due process focus, even after holding, in *Malloy* v. *Hogan*, 378 U. S. 1 (1964), that the Fifth Amendment privilege against compulsory self-incrimination applies to the States. See *Miller* v. *Fenton*, *supra*, at 109–110.

Thus the cases considered by this Court over the 50 years since *Brown* v. *Mississippi* have focused upon the crucial element of police overreaching.[1] While each confession case

---

[1] *E. g.*, *Mincey* v. *Arizona*, 437 U. S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald* v. *Wisconsin*, 390 U. S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher* v. *Alabama*, 389 U. S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis* v. *North Carolina*, 384 U. S. 737 (1966) (16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics); *Reck* v. *Pate*, 367 U. S. 433 (1961)

has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct. Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law.[2] Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the "voluntariness" calculus. See *Spano* v. *New York*, 360 U. S. 315 (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional "voluntariness."

Respondent relies on *Blackburn* v. *Alabama*, 361 U. S. 199 (1960), and *Townsend* v. *Sain*, 372 U. S. 293 (1963), for the proposition that the "deficient mental condition of the defendants in those cases was sufficient to render their confessions involuntary." Brief for Respondent 20. But respondent's reading of *Blackburn* and *Townsend* ignores the integral element of police overreaching present in both cases. In *Blackburn*, the Court found that the petitioner was probably insane at the time of his confession and the police learned during the interrogation that he had a history of mental prob-

_____

(defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe* v. *Connecticut*, 367 U. S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne* v. *Arkansas*, 356 U. S. 560 (1958) (defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Ashcraft* v. *Tennessee*, 322 U. S. 143 (1944) (defendant questioned by relays of officers for 36 hours without an opportunity for sleep).

[2] Even where there is causal connection between police misconduct and a defendant's confession, it does not automatically follow that there has been a violation of the Due Process Clause. See, *e. g.*, *Frazier* v. *Cupp*, 394 U. S. 731, 739 (1969).

lems.   The police exploited this weakness with coercive tactics: "the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of Blackburn's friends, relatives, or legal counsel; [and] the composition of the confession by the Deputy Sheriff rather than by Blackburn."   361 U. S., at 207–208.   These tactics supported a finding that the confession was involuntary.   Indeed, the Court specifically condemned police activity that "wrings a confession out of an accused against his will."   *Id.*, at 206–207.   *Townsend* presented a similar instance of police wrongdoing.   In that case, a police physician had given Townsend a drug with truth-serum properties.   372 U. S., at 298–299.   The subsequent confession, obtained by officers who knew that Townsend had been given drugs, was held involuntary.   These two cases demonstrate that while mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry.

Our "involuntary confession" jurisprudence is entirely consistent with the settled law requiring some sort of "state action" to support a claim of violation of the Due Process Clause of the Fourteenth Amendment.   The Colorado trial court, of course, found that the police committed no wrongful acts, and that finding has been neither challenged by respondent nor disturbed by the Supreme Court of Colorado.   The latter court, however, concluded that sufficient state action was present by virtue of the admission of the confession into evidence in a court of the State.   702 P. 2d, at 728–729.

The difficulty with the approach of the Supreme Court of Colorado is that it fails to recognize the essential link between coercive activity of the State, on the one hand, and a resulting confession by a defendant, on the other.   The flaw in respondent's constitutional argument is that it would expand our previous line of "voluntariness" cases into a far-ranging requirement that courts must divine a defendant's

motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision.

The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause. See *Walter* v. *United States*, 447 U. S. 649, 656 (1980); *Coolidge* v. *New Hampshire*, 403 U. S. 443, 487–488 (1971); *Burdeau* v. *McDowell*, 256 U. S. 465, 476 (1921). We have also observed that "[j]urists and scholars uniformly have recognized that the exclusionary rule imposes a substantial cost on the societal interest in law enforcement by its proscription of what concededly is relevant evidence." *United States* v. *Janis*, 428 U. S. 433, 448–449 (1976). See also *United States* v. *Havens*, 446 U. S. 620, 627 (1980); *United States* v. *Calandra*, 414 U. S. 338 (1974). Moreover, suppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees. The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution. See *United States* v. *Leon*, 468 U. S. 897, 906–913 (1984). Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained.

We have previously cautioned against expanding "currently applicable exclusionary rules by erecting additional barriers to placing truthful and probative evidence before state juries . . . ." *Lego* v. *Twomey*, 404 U. S. 477, 488–489 (1972). We abide by that counsel now. "[T]he central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," *Delaware* v. *Van Arsdall*, 475 U. S. 673, 681 (1986), and while we have previously held that exclusion of evidence may be necessary to protect constitutional guarantees, both the necessity for the collateral inquiry and the exclusion of evidence deflect a criminal trial from its basic purpose. Respondent would now have us re-

quire sweeping inquiries into the state of mind of a criminal defendant who has confessed, inquiries quite divorced from any coercion brought to bear on the defendant by the State. We think the Constitution rightly leaves this sort of inquiry to be resolved by state laws governing the admission of evidence and erects no standard of its own in this area. A statement rendered by one in the condition of respondent might be proved to be quite unreliable, but this is a matter to be governed by the evidentiary laws of the forum, see, *e. g.,* Fed. Rule Evid. 601, and not by the Due Process Clause of the Fourteenth Amendment. "The aim of the requirement of due process is not to exclude presumptively false evidence, but to prevent fundamental unfairness in the use of evidence, whether true or false." *Lisenba* v. *California,* 314 U. S. 219, 236 (1941).

We hold that coercive police activity is a necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. We also conclude that the taking of respondent's statements, and their admission into evidence, constitute no violation of that Clause.

## III

### A

The Supreme Court of Colorado went on to affirm the trial court's ruling that respondent's later statements made while in custody should be suppressed because respondent had not waived his right to consult an attorney and his right to remain silent. That court held that the State must bear its burden of proving waiver of these *Miranda* rights by "clear and convincing evidence." 702 P. 2d, at 729. Although we have stated in passing that the State bears a "heavy" burden in proving waiver, *Tague* v. *Louisiana,* 444 U. S. 469 (1980) *(per curiam); North Carolina* v. *Butler* 441 U. S. 369, 373 (1979); *Miranda* v. *Arizona,* 384 U. S., at 475, we have never

held that the "clear and convincing evidence" standard is the appropriate one.

In *Lego* v. *Twomey*, *supra*, this Court upheld a procedure in which the State established the voluntariness of a confession by no more than a preponderance of the evidence. We upheld it for two reasons. First, the voluntariness determination has nothing to do with the reliability of jury verdicts; rather, it is designed to determine the presence of police coercion. Thus, voluntariness is irrelevant to the presence or absence of the elements of a crime, which must be proved beyond a reasonable doubt. See *In re Winship*, 397 U. S. 358 (1970). Second, we rejected Lego's assertion that a high burden of proof was required to serve the values protected by the exclusionary rule. We surveyed the various reasons for excluding evidence, including a violation of the requirements of *Miranda* v. *Arizona*, *supra*, and we stated that "[i]n each instance, and without regard to its probative value, evidence is kept from the trier of guilt or innocence for reasons wholly apart from enhancing the reliability of verdicts." *Lego* v. *Twomey*, 404 U. S., at 488. Moreover, we rejected the argument that "the importance of the values served by exclusionary rules is itself sufficient demonstration that the Constitution also requires admissibility to be proved beyond a reasonable doubt." *Ibid.* Indeed, the Court found that "no substantial evidence has accumulated that federal rights have suffered from determining admissibility by a preponderance of the evidence." *Ibid.*

We now reaffirm our holding in *Lego:* Whenever the State bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of our *Miranda* doctrine, the State need prove waiver only by a preponderance of the evidence. See *Nix* v. *Williams*, 467 U. S. 431, 444, and n. 5 (1984); *United States* v. *Matlock*, 415 U. S. 164, 178, n. 14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence . . .").

Cf. *Moore* v. *Michigan*, 355 U. S. 155, 161–162 (1957). If, as we held in *Lego* v. *Twomey, supra,* the voluntariness of a confession need be established only by a preponderance of the evidence, then a waiver of the auxiliary protections established in *Miranda* should require no higher burden of proof. "[E]xclusionary rules are very much aimed at deterring lawless conduct by police and prosecution and it is very doubtful that escalating the prosecution's burden of proof in . . . suppression hearings would be sufficiently productive in this respect to outweigh the public interest in placing probative evidence before juries for the purpose of arriving at truthful decisions about guilt or innocence." *Lego* v. *Twomey, supra,* at 489. See also *United States* v. *Leon,* 468 U. S., at 906–913.

## B

We also think that the Supreme Court of Colorado was mistaken in its analysis of the question whether respondent had waived his *Miranda* rights in this case.[3] Of course, a waiver must at a minimum be "voluntary" to be effective against an accused. *Miranda, supra,* at 444, 476; *North Carolina* v. *Butler, supra,* at 373. The Supreme Court of Colorado in addressing this question relied on the testimony of the court-appointed psychiatrist to the effect that respondent was not capable of making a "free decision with respect to his constitutional right of silence . . . and his constitutional right to confer with a lawyer before talking to the police." 702 P. 2d, at 729.

We think that the Supreme Court of Colorado erred in importing into this area of constitutional law notions of "free will" that have no place there. There is obviously no reason to require more in the way of a "voluntariness" inquiry in the

[3] Petitioner conceded at oral argument that when Officer Anderson handcuffed respondent, the custody requirement of *Miranda* was satisfied. For purposes of our decision we accept that concession, and we similarly assume that the police officers "interrogated" respondent within the meaning of *Miranda.*

*Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion. See *United States* v. *Washington,* 431 U. S. 181, 187 (1977); *Miranda, supra,* at 460. Indeed, the Fifth Amendment privilege is not concerned "with moral and psychological pressures to confess emanating from sources other than official coercion." *Oregon* v. *Elstad,* 470 U. S. 298, 305 (1985). The voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on "free choice" in any broader sense of the word. See *Moran* v. *Burbine,* 475 U. S., at 421 ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . . [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *Fare* v. *Michael C.,* 442 U. S. 707, 726–727 (1979) (The defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*").

Respondent urges this Court to adopt his "free will" rationale, and to find an attempted waiver invalid whenever the defendant feels compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow from the police. But such a treatment of the waiver issue would "cut this Court's holding in *[Miranda]* completely loose from its own explicitly stated rationale." *Beckwith* v. *United States,* 425 U. S. 341, 345 (1976). *Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that. Respondent's perception of coercion flowing from the "voice of God," however important or significant such a

perception may be in other disciplines, is a matter to which the United States Constitution does not speak.

## IV

The judgment of the Supreme Court of Colorado is accordingly reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.[4]

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and concurring in the judgment.

I join Parts I, II, III–B, and IV of the Court's opinion and its judgment.

I refrain, however, from joining Part III–A of the opinion. Whatever may be the merits of the issue discussed there, which concerns the level of the State's burden of proof in showing that respondent had waived his rights under *Miranda* v. *Arizona,* 384 U. S. 436 (1966), that issue was neither raised nor briefed by the parties, and, in my view, it is not necessary to the decision.

JUSTICE STEVENS, concurring in the judgment in part and dissenting in part.

Respondent made incriminatory statements both before and after he was handcuffed and taken into custody. The only question presented by the Colorado District Attorney in his certiorari petition concerned the admissibility of respondent's precustodial statements.  Pet. for Cert. i, 14–15.[1]  I

---

[4] It is possible to read the opinion of the Supreme Court of Colorado as finding respondent's *Miranda* waiver invalid on other grounds.  Even if that is the case, however, we nonetheless reverse the judgment in its entirety because of our belief that the Supreme Court of Colorado's analysis was influenced by its mistaken view of "voluntariness" in the constitutional sense.  Reconsideration of other issues, not inconsistent with our opinion, is of course open to the Supreme Court of Colorado on remand.

[1] The petition states: "[Respondent's] later confession, which involves a *Miranda* issue, is not an issue in this petition."  Pet. for Cert. 15.

agree with the State of Colorado that the United States Constitution does not require suppression of those statements, but in reaching that conclusion, unlike the Court, I am perfectly willing to accept the state trial court's finding that the statements were involuntary.

The state trial court found that, in view of the "overwhelming evidence presented by the Defense," the prosecution did not meet its burden of demonstrating that respondent's initial statements to Officer Anderson were voluntary. App. 47–48. Nevertheless, in my opinion, the use of these involuntary precustodial statements does not violate the Fifth Amendment because they were not the product of state compulsion. Although they may well be so unreliable that they could not support a conviction, at this stage of the proceeding I could not say that they have no probative force whatever. The fact that the statements were involuntary—just as the product of Lady Macbeth's nightmare was involuntary[2]—does not mean that their use for whatever evidentiary value they may have is fundamentally unfair or a denial of due process.

The postcustodial statements raise an entirely distinct question. When the officer whom respondent approached elected to handcuff him and to take him into custody, the police assumed a fundamentally different relationship with him. Prior to that moment, the police had no duty to give respondent *Miranda* warnings and had every right to continue their exploratory conversation with him.[3] Once the custodial relationship was established, however, the questioning as-

---

[2] "What, will these hands ne'er be clean?

.        .        .        .

"Here's the smell of the blood still: all the perfumes of Arabia will not sweeten this little hand." W. Shakespeare, Macbeth, Act V, scene 1, lines 41, 47.

Lady Macbeth's "eyes are open," "but their sense is shut." *Id.*, at line 23.

[3] See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 247 (1973) ("*Miranda*, of course, did not reach investigative questioning of a person not in custody . . .").

sumed a presumptively coercive character.   *Miranda* v. *Arizona*, 384 U. S. 436, 467 (1966).   In my opinion the questioning could not thereafter go forward in the absence of a valid waiver of respondent's constitutional rights unless he was provided with counsel.   Since it is undisputed that respondent was not then competent to stand trial, I would also conclude that he was not competent to waive his constitutional right to remain silent.[4]

The Court seems to believe that a waiver can be voluntary even if it is not the product of an exercise of the defendant's "'free will.'"   *Ante,* at 169.   The Court's position is not only incomprehensible to me; it is also foreclosed by the Court's recent pronouncement in *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986), that "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice . . . ."[5]   Because respondent's waiver was not voluntary in that sense, his custodial interrogation was presumptively coercive.   The Colorado Supreme Court was unquestionably correct in concluding that his post-custodial incriminatory statements were inadmissible.

Accordingly, I concur in the judgment insofar as it applies to respondent's precustodial statements but respectfully dis-

---

[4] The trial court found:

"Here, in the Court's estimation, there's no question that the Defendant did not exercise free will in choosing to talk to the police.   He exercised a choice both *[sic]* of which were mandated by auditory hallucination, had no basis in reality, and were the product of a psychotic break with reality. The Defendant at the time of the confession had absolutely in the Court's estimation no volition or choice to make.   He was compelled by his illness to do that which he did, and he did so in a manner which is not unusual for people who suffer schizophrenia."   App. 47.

[5] The Court relies on the further statement in *Moran* v. *Burbine,* 475 U. S., at 421, that the waiver must result from "free and deliberate choice rather than intimidation, coercion, or deception . . . ."   *Ante,* at 170.   Obviously this dichotomy does not exhaust the possibilities; the mere absence of police misconduct does not establish that the suspect has made a free and deliberate choice when the suspect is not competent to stand trial.

sent from the Court's disposition of the question that was not presented by the certiorari petition.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Today the Court denies Mr. Connelly his fundamental right to make a vital choice with a sane mind, involving a determination that could allow the State to deprive him of liberty or even life. This holding is unprecedented: "Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane . . . ." *Blackburn* v. *Alabama*, 361 U. S. 199, 207 (1960). Because I believe that the use of a mentally ill person's involuntary confession is antithetical to the notion of fundamental fairness embodied in the Due Process Clause, I dissent.

## I

The respondent's seriously impaired mental condition is clear on the record of this case. At the time of his confession, Mr. Connelly suffered from a "longstanding severe mental disorder," diagnosed as chronic paranoid schizophrenia. 1 Record 16. He had been hospitalized for psychiatric reasons five times prior to his confession; his longest hospitalization lasted for seven months. *Id.*, at 12. Mr. Connelly heard imaginary voices and saw nonexistent objects. Tr. 56. He believed that his father was God, and that he was a reincarnation of Jesus. 1 Record 15.

At the time of his confession, Mr. Connelly's mental problems included "grandiose and delusional thinking." *Id.*, at 16. He had a known history of "thought withdrawal and insertion." *Id.*, at 14. Although physicians had treated Mr. Connelly "with a wide variety of medications in the past including antipsychotic medications," he had not taken any antipsychotic medications for at least six months prior to his confession. *Id.*, at 12. Following his arrest, Mr. Connelly initially was found incompetent to stand trial because the

court-appointed psychiatrist, Dr. Metzner, "wasn't very confident that he could consistently relate accurate information." Tr. 68. Dr. Metzner testified that Mr. Connelly was unable "to make free and rational choices" due to auditory hallucinations: "[W]hen he was read his *Miranda* rights, he probably had the capacity to know that he was being read his *Miranda* rights [but] he wasn't able to use that information because of the command hallucinations that he had experienced." *Id.,* at 56–57. He achieved competency to stand trial only after six months of hospitalization and treatment with antipsychotic and sedative medications. *Id.,* at 68; 1 Record 16.

The state trial court found that the "overwhelming evidence presented by the Defense" indicated that the prosecution did not meet its burden of demonstrating by a preponderance of the evidence that the initial statement to Officer Anderson was voluntary. While the court found no police misconduct, it held:

> "[T]here's no question that the Defendant did not exercise free will in choosing to talk to the police. He exercised a choice both *[sic]* of which were mandated by auditory hallucination, had no basis in reality, and were the product of a psychotic break with reality. The Defendant at the time of the confession had absolutely in the Court's estimation no volition or choice to make." App. 47.

The trial court also held that the State had not shown by clear and convincing evidence that the defendant had waived his *Miranda* right to counsel and to self-incrimination "voluntarily, knowingly and intelligently." App. 48.

The Supreme Court of Colorado affirmed after evaluating "the totality of circumstances" surrounding the unsolicited confession and the waiver of *Miranda* rights. 702 P. 2d 722, 728 (1985).

## II

The absence of police wrongdoing should not, by itself, determine the voluntariness of a confession by a mentally ill person. The requirement that a confession be voluntary reflects a recognition of the importance of free will and of reliability in determining the admissibility of a confession, and thus demands an inquiry into the totality of the circumstances surrounding the confession.

### A

Today's decision restricts the application of the term "involuntary" to those confessions obtained by police coercion. Confessions by mentally ill individuals or by persons coerced by parties other than police officers are now considered "voluntary." The Court's failure to recognize all forms of involuntariness or coercion as antithetical to due process reflects a refusal to acknowledge free will as a value of constitutional consequence. But due process derives much of its meaning from a conception of fundamental fairness that emphasizes the right to make vital choices voluntarily: "The Fourteenth Amendment secures against state invasion . . . the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will . . . ." *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964). This right requires vigilant protection if we are to safeguard the values of private conscience and human dignity.

This Court's assertion that we would be required "to establish a brand new constitutional right" to recognize the respondent's claim, *ante*, at 166, ignores 200 years of constitutional jurisprudence.[1] As we stated in *Culombe* v. *Connecticut*, 367 U. S. 568 (1961):

---

[1] Cf. *Bram* v. *United States*, 168 U. S. 532, 547–548 (1897) (reviewing the "rule [of law] in England at the time of the adoption of the Constitution and of the Fifth Amendment" and citing W. Hawkins, Pleas of the Crown (6th ed. 1787): "[a] confession, therefore, whether made upon an official examination or *in discourse with private persons*, which is obtained from a defendant, either by the flattery of hope, or by the impressions of fear,

"The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness. Is the confession the product of an essentially free and unconstrained choice by its maker? . . . The line of distinction is that at which governing self-direction is lost *and compulsion, of whatever nature or however infused,* propels or helps to propel the confession." *Id.,* at 602 (emphasis added).

A true commitment to fundamental fairness requires that the inquiry be "not whether the conduct of state officers in obtaining the confession is shocking, but whether the confession was 'free and voluntary' . . . ." *Malloy* v. *Hogan, supra,* at 7.

We have never confined our focus to police coercion, because the value of freedom of will has demanded a broader inquiry. See *Blackburn* v. *Alabama,* 361 U. S., at 206–207. The confession cases decided by this Court over the 50 years since *Brown* v. *Mississippi,* 297 U. S. 278 (1936), have focused upon both police overreaching and free will. While it is true that police overreaching has been an element of every confession case to date, see *ante,* at 163–164, n. 1, it is also true that in every case the Court has made clear that ensuring that a confession is a product of free will is an independent concern.[2] The fact that involuntary confessions

---

however slightly the emotions may be implanted, . . . is not admissible evidence; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction") (emphasis added).

[2] *E. g., Mincey* v. *Arizona,* 437 U. S. 385, 398 (1978) ("It is hard to imagine a situation less conducive to the exercise of 'a rational intellect and a free will' than Mincey's"); *Greenwald* v. *Wisconsin,* 390 U. S. 519, 521 (1968) ("Considering the totality of these circumstances, we do not think it credible that petitioner's statements were the product of his free and rational choice"); *Beecher* v. *Alabama,* 389 U. S. 35, 37 (1967) ("Still in a 'kind of slumber' from his last morphine injection, feverish, and in intense pain, the petitioner signed the written confessions thus prepared for him"); *Davis* v. *North Carolina,* 384 U. S. 737, 742 (1966) ("His level of intelli-

have always been excluded in part because of police over-reaching signifies only that this is a case of first impression. Until today, we have never upheld the admission of a confession that does not reflect the exercise of free will.

The Court cites *Townsend* v. *Sain,* 372 U. S. 293 (1963), and *Blackburn* in support of its view that police wrongdoing should be the central focus of inquiry. In *Townsend,* we overturned a murder conviction because the defendant's conviction was determined to be involuntary. The defendant suffered from stomach pains induced by heroin withdrawal. The police properly contacted a physician who administered medications alleviating the withdrawal symptoms. The defendant then confessed. 372 U. S., at 298. Although the physician denied that he purposely administered "truth serum," there was an indication that the medications could have had such a side effect upon a narcotic addict. *Id.,* at 302.

The *Townsend* Court examined "many relevant circumstances": "Among these are [the defendant's] lack of counsel at the time, his drug addiction, the fact that he was a 'near mental defective,' and his youth and inexperience." *Id.,* at 308, n. 4. According to today's Court, the police wrongdoing in *Townsend* was that the police physician had allegedly

---

gence is such that it prompted the comment by the court below, even while deciding against him on his claim of involuntariness, that there is a moral question whether a person of Davis' mentality should be executed"); *Reck* v. *Pate,* 367 U. S. 433, 440 (1961) ("If [a defendant's will was overborne], the confession cannot be deemed 'the product of a rational intellect and a free will'"); *Culombe* v. *Connecticut,* 367 U. S. 568, 583 (1961) ("[A]n extra-judicial confession, if it was to be offered in evidence against a man, must be the product of his own free choice"); *Payne* v. *Arkansas,* 356 U. S. 560, 567 (1958) (footnotes omitted) ("It seems obvious from the *totality* of this course of conduct, and particularly the culminating threat of mob violence, that the confession was coerced and did not constitute an 'expression of free choice'"); *Ashcraft* v. *Tennessee,* 322 U. S. 143, 147 (1944) ("He was induced by the fear of violence at the hands of a mob and by fear of the officers").

given the defendant a drug with truth-serum properties, and that the confession was obtained by officers who knew that the defendant had been given drugs. *Ante*, at 165. But, in fact, "the police . . . did not know what [medications] the doctor had given [the defendant]." 372 U. S., at 299. And the *Townsend* Court expressly states that police wrongdoing was not an essential factor:

> "It is not significant that the drug may have been administered and the questions asked by persons unfamiliar with hyoscine's properties as a 'truth serum,' if these properties exist. Any questioning by police officers which *in fact* produces a confession which is not the product of a free intellect renders that confession inadmissible. The Court has usually so stated the test." *Id.*, at 308 (footnote omitted; emphasis in original).

Furthermore, in prescient refutation of this Court's "police wrongdoing" theory, the *Townsend* Court analyzed *Blackburn*, the other case relied upon by this Court to "demonstrate" that police wrongdoing was a more important factor than the defendant's state of mind. The Court in *Townsend* stated:

> "[I]n *Blackburn* v. *Alabama*, 361 U. S. 199, we held *irrelevant* the absence of evidence of improper purpose on the part of the questioning officers. There the evidence indicated that the interrogating officers thought the defendant sane when he confessed, but we judged the confession inadmissible because the probability was that the defendant was *in fact* insane at the time." 372 U. S., at 309 (emphasis added).

Thus the *Townsend* Court interpreted *Blackburn* as a case involving a confession by a mentally ill defendant in which the police harbored no improper purpose.

This Court abandons this precedent in favor of the view that only confessions rendered involuntary by some state action are inadmissible, and that the only relevant form of state

action is police conduct. But even if state action is required, police overreaching is not its only relevant form. The Colorado Supreme Court held that the trial court's admission of the involuntary confession into evidence is also state action. The state court's analysis is consistent with *Brown* v. *Mississippi*, 297 U. S. 278 (1936), on which this Court so heavily relies. *Brown*, a case involving the use of confessions at trial, makes clear that "[t]he due process clause requires 'that state action, *whether through one agency or another*, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions.'" *Id.*, at 286 (emphasis added), citing *Hebert* v. *Louisiana*, 272 U. S. 312, 316 (1926). Police conduct constitutes but one form of state action. "The objective of deterring improper police conduct is only part of the larger objective of safeguarding the integrity of our adversary system." *Harris* v. *New York*, 401 U. S. 222, 231 (1971) (BRENNAN, J., dissenting).[3]

---

[3] Even if police knowledge of the defendant's insanity is required to exclude an involuntary confession, the record supports a finding of police knowledge in this case. The Court accepts the trial court's finding of no police wrongdoing since, in the trial judge's view, none of the police officers knew that Mr. Connelly was insane. Tr. 83–84. After plenary review of the record, see *Miller* v. *Fenton*, 474 U. S. 104, 115 (1985), I conclude that this finding is clearly erroneous.

When the defendant confessed to Officer Anderson, the officer's first thought was that Mr. Connelly was a "crackpot." Tr. 8. Today's Court describes Officer Anderson as "[u]nderstandably bewildered." *Ante*, at 160. After giving *Miranda* warnings, the officer questioned the defendant about whether he used drugs or alcohol. He also asked Mr. Connelly if he had been treated for any mental disorders, and the defendant responded that he had been treated in five different mental hospitals. Tr. 14, 17. While this Court concludes that "Detective Antuna perceived no indication whatsoever that respondent was suffering from any kind of mental illness," *ante*, at 161, the record indicates that Officer Anderson informed the detective about the defendant's five hospitalizations in mental institutions. Tr. 18. Thus, even under this Court's test requiring police wrongdoing, the record indicates that the officers here had sufficient knowledge about the defendant's mental incapacity to render the confession "involuntary."

The only logical "flaw" which the Court detects in this argument is that it would require courts to "divine a defendant's motivation for speaking or acting as he did even though there be no claim that governmental conduct coerced his decision." *Ante*, at 165. Such a criticism, however, ignores the fact that we have traditionally examined the totality of the circumstances, including the motivation and competence of the defendant, in determining whether a confession is voluntary. Even today's Court admits that "as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' calculus." *Ante*, at 164. The Court's holding that involuntary confessions are only those procured through police misconduct is thus inconsistent with the Court's historical insistence that only confessions reflecting an exercise of free will be admitted into evidence.

B

Since the Court redefines voluntary confessions to include confessions by mentally ill individuals, the reliability of these confessions becomes a central concern. A concern for reliability is inherent in our criminal justice system, which relies upon accusatorial rather than inquisitorial practices. While an inquisitorial system prefers obtaining confessions from criminal defendants, an accusatorial system must place its faith in determinations of "guilt by evidence independently and freely secured." *Rogers* v. *Richmond*, 365 U. S. 534, 541 (1961). In *Escobedo* v. *Illinois*, 378 U. S. 478 (1964), we justified our reliance upon accusatorial practices:

> "We have learned the lesson of history, ancient and modern, that a system of criminal law enforcement which comes to depend on the 'confession' will, in the long run, be less reliable and more subject to abuses than a system which depends on extrinsic evidence independently secured through skillful investigation." *Id.*, at 488–489 (footnotes omitted).

Our interpretation of the Due Process Clause has been shaped by this preference for accusatorial practices, see *Miller* v. *Fenton,* 474 U. S. 104, 109–110 (1985); *Malloy* v. *Hogan,* 378 U. S., at 7; *Watts* v. *Indiana,* 338 U. S. 49, 54 (1949), and by a concern for reliability, see *Barefoot* v. *Estelle,* 463 U. S. 880, 925 (1983) (BLACKMUN, J., dissenting); *Foster* v. *California,* 394 U. S. 440, 442 (1969).

Our distrust for reliance on confessions is due, in part, to their decisive impact upon the adversarial process. Triers of fact accord confessions such heavy weight in their determinations that "the introduction of a confession makes the other aspects of a trial in court superfluous, and the real trial, for all practical purposes, occurs when the confession is obtained." E. Cleary, McCormick on Evidence 316 (2d ed. 1972); see also *Miranda* v. *Arizona,* 384 U. S. 436, 466 (1966); *Mapp* v. *Ohio,* 367 U. S. 643, 685 (1961). No other class of evidence is so profoundly prejudicial. See Saltzburg, Standards of Proof and Preliminary Questions of Fact, 27 Stan. L. Rev. 271, 293 (1975). "Thus the decision to confess before trial amounts in effect to a waiver of the right to require the state at trial to meet its heavy burden of proof." Cleary, *supra,* at 316.

Because the admission of a confession so strongly tips the balance against the defendant in the adversarial process, we must be especially careful about a confession's reliability. We have to date not required a finding of reliability for involuntary confessions only because *all* such confessions have been excluded upon a finding of involuntariness, regardless of reliability. See *Jackson* v. *Denno,* 378 U. S. 368, 383–386 (1964).[4] The Court's adoption today of a restrictive definition of an "involuntary" confession will require heightened scrutiny of a confession's reliability.

---

[4] Prior to establishing this rule excluding all involuntary confessions, we held the view that the Fifth Amendment, at bottom, served as "a guarantee against conviction on inherently untrustworthy evidence." *Stein* v. *New York,* 346 U. S. 156, 192 (1953).

The instant case starkly highlights the danger of admitting a confession by a person with a severe mental illness. The trial court made no findings concerning the reliability of Mr. Connelly's involuntary confession, since it believed that the confession was excludable on the basis of involuntariness. However, the overwhelming evidence in the record points to the unreliability of Mr. Connelly's delusional mind. Mr. Connelly was found incompetent to stand trial because he was unable to relate accurate information, and the court-appointed psychiatrist indicated that Mr. Connelly was actively hallucinating and exhibited delusional thinking at the time of his confession. See *supra*, at 174. The Court, in fact, concedes that "[a] statement rendered by one in the condition of respondent might be proved to be quite unreliable . . . ." *Ante*, at 167.

Moreover, the record is barren of any corroboration of the mentally ill defendant's confession. No physical evidence links the defendant to the alleged crime. Police did not identify the alleged victim's body as the woman named by the defendant. Mr. Connelly identified the alleged scene of the crime, but it has not been verified that the unidentified body was found there or that a crime actually occurred there. There is not a shred of competent evidence in this record linking the defendant to the charged homicide. There is only Mr. Connelly's confession.

Minimum standards of due process should require that the trial court find substantial indicia of reliability, on the basis of evidence extrinsic to the confession itself, before admitting the confession of a mentally ill person into evidence. I would require the trial court to make such a finding on remand. To hold otherwise allows the State to imprison and possibly to execute a mentally ill defendant based solely upon an inherently unreliable confession.

III

This Court inappropriately reaches out to address two *Miranda* issues not raised by the prosecutor in his petition

for certiorari: (1) the burden of proof upon the government in establishing the voluntariness of *Miranda* rights, and (2) the effect of mental illness on the waiver of those rights in the absence of police misconduct.[5] I emphatically dissent from the Court's holding that the government need prove waiver by only a preponderance of the evidence, and from its conclusion that a waiver is automatically voluntary in the absence of police coercion.

A

In holding that the government need only prove the voluntariness of the waiver of *Miranda* rights by a preponderance of the evidence, the Court ignores the explicit command of *Miranda:*

"If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy* burden rests on the government to demonstrate that the defend-

---

[5] In deciding to hear this case, this Court took "the unprecedented step of rewriting a prosecutor's certiorari petition for him, enabling him to seek reversal on a ground he did not present himself." *Colorado* v. *Connelly,* 474 U. S. 1050, 1051 (1986) (BRENNAN, J., dissenting from briefing order). The prosecutor expressly limited his petition to this Court to the issue of the suppression of the involuntary confession. Pet. for Cert. 15. Despite this, the Court directed the parties to brief the question of whether the defendant's mental condition rendered his waiver of *Miranda* rights ineffective.

In addition, the Court today decides yet another issue neither raised nor briefed by either party. It holds that the government may establish the defendant's voluntary waiver of his *Miranda* rights by only a preponderance of the evidence.

The Court also requires the state court to readdress a separate and independent basis for finding the waiver invalid. Quite apart from finding the *Miranda* waiver involuntary, the Colorado Supreme Court found that it was not an intelligent and knowing decision. Although unaffected by this Court's new analysis of the voluntariness requirement, the state court is forced to reconsider this independent justification for its decision. *Ante,* at 171, n. 4. Such actions reinforce the Court's "appearance of being not merely the champion, but actually an arm of the prosecution." 474 U. S., at 1052.

ant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. This Court has always set *high* standards of proof for the waiver of constitutional rights, and we re-assert these standards as applied to in-custody interrogation." *Miranda* v. *Arizona,* 384 U. S., at 475 (emphasis added; citations omitted).

In recognition of the importance of the Due Process Clause and the Fifth Amendment, we always have characterized the State's burden of proof on a *Miranda* waiver as "great" and "heavy." See, *e. g., Tague* v. *Louisiana,* 444 U. S. 469, 470–471 (1980); *North Carolina* v. *Butler,* 441 U. S. 369, 373 (1979); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 236 (1973). Furthermore, under the Sixth Amendment, we have required the prosecution to meet a clear and convincing standard in demonstrating that evidence is not tainted by the absence of counsel at police lineups. See *United States* v. *Wade,* 388 U. S. 218, 240 (1967). Imposing the weakest possible burden of proof for waiver of *Miranda*'s right to counsel plainly ignores this precedent.

The Court bases its holding on *Lego* v. *Twomey,* 404 U. S. 477 (1972). The four-Member *Lego* Court concluded that a confession obtained when the defendant was not in custody could be admitted into evidence if the prosecution proved its voluntariness by a preponderance of the evidence.[6] The *Lego* Court's rationale rested on two related premises. First, since *all* involuntary confessions were excluded, even if truthful, the voluntariness determination was not based on reliability. Thus the requirement of proof beyond reasonable doubt for every fact necessary to constitute the charged crime, *In re Winship,* 397 U. S. 358, 364 (1970), was not

---

[6] Contrary to this Court's assertion, nowhere does the *Lego* Court state that "the voluntariness determination . . . is designed to determine the presence of police coercion." *Ante,* at 168. See *Lego* v. *Twomey.* The *Lego* Court did not distinguish coercion by police from coercion exerted from other sources.

applicable, because the concern of the *Winship* Court was the reliability of verdicts. 404 U. S., at 482–486. Second, the four Justices constituting the majority in *Lego* rejected the petitioner's argument that proof beyond reasonable doubt would best serve the constitutional values that the exclusionary rule was meant to protect. The four again emphasized that reliability of evidence was not a concern since all involuntary confessions were excluded. It found no evidence that federal rights had suffered by imposing the weakest standard of proof for exclusionary rules. *Id.*, at 487–489.

I adhere to my *Lego* dissent. The constitutional ideal that involuntary confessions should never be admitted against the defendant in criminal cases deserves protection by the highest standard of proof—proof beyond a reasonable doubt. *Id.*, at 491. The lower standard of proof results "in the admission of more involuntary confessions than would be admitted were the prosecution required to meet a higher standard." *Id.*, at 493. "Compelled self-incrimination is so alien to the American sense of justice that I see no way that such a view could ever be justified." *Id.*, at 494.

But even if the four Justices in *Lego* were correct, their holding is irrelevant to this case. The presumption underlying the reasoning in *Lego* was that reliability was not an important concern because involuntary confessions were always excluded. Today the Court redefines voluntariness so that involuntary confessions that are not the result of police wrongdoing are no longer excluded under the voluntariness standard. My analysis in Part II–B shows that reliability should now become a major concern in the admission of such confessions. Since the reliability of verdicts is at stake, proof beyond a reasonable doubt constitutes the appropriate standard.[7]

---

[7] Furthermore, *Lego* established only that proof beyond a reasonable doubt was an inappropriately high standard. The decision has been criticized for never demonstrating affirmatively that the choice of the preponderance-of-the-evidence standard was more appropriate than the

Finally, *Lego* involved a situation in which the defendant was not in custody. By contrast, a *Miranda* waiver is found while a defendant is in police custody. The coercive custodial interrogation atmosphere poses an increased danger of police overreaching. The police establish the isolated conditions of custody and can document the voluntary waiver of *Miranda* rights through disinterested witnesses or recordings. See *Miranda* v. *Arizona, supra,* at 475. It is therefore appropriate to place a higher burden of proof on the government in establishing a waiver of *Miranda* rights.

The ultimate irony is that, even accepting the preponderance of the evidence as the correct standard, the prosecution still failed to meet this burden of proof. The Colorado Supreme Court found that Dr. Metzner, the court-appointed psychiatrist and the only expert to testify, "clearly established" that Mr. Connelly "was incapable" of making a "free decision" respecting his *Miranda* rights. 702 P. 2d, at 729. Thus the prosecution failed—even by the modest standard imposed today—to prove that Mr. Connelly voluntarily waived his *Miranda* rights.

B

The Court imports its voluntariness analysis, which makes police coercion a requirement for a finding of involuntariness, into its evaluation of the waiver of *Miranda* rights. My reasoning in Part II–A, *supra,* at 176–181, applies *a fortiori* to involuntary confessions made in custody involving the waiver of constitutional rights. See also *Miranda* v. *Arizona, supra,* at 460. I will not repeat here what I said there.

I turn then to the second requirement, apart from the voluntariness requirement, that the State must satisfy to establish a waiver of *Miranda* rights. Besides being voluntary,

use of the clear-and-convincing-evidence standard. See Saltzburg, Standards of Proof and Preliminary Questions of Fact, 27 Stan. L. Rev. 271, 278 (1975). Here the Colorado Supreme Court chose to apply the clear-and-convincing-evidence standard and the *Lego* analysis cannot justify rejection of this intermediate standard.

the waiver must be knowing and intelligent. See *Moran* v. *Burbine,* 475 U. S. 412, 421 (1986). We recently noted that "the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Ibid.* The two requirements are independent: "Only if the 'totality of the circumstances surrounding the interrogation' reveals *both* an uncoerced choice *and* the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Ibid.* (emphasis added).

Since the Colorado Supreme Court found that Mr. Connelly was "clearly" unable to make an "intelligent" decision, clearly its judgment should be affirmed. The Court reverses the entire judgment, however, without explaining how a "mistaken view of voluntariness" could "taint" this independent justification for suppressing the custodial confession, but leaving the Colorado Supreme Court free on remand to reconsider other issues, not inconsistent with the Court's opinion. Such would include, in my view, whether the requirement of a knowing and intelligent waiver was satisfied. See *ante,* at 171, n. 4. Moreover, on the remand, today's holding does not, of course, preclude a contrary resolution of this case based upon the State's separate interpretation of its own Constitution. See *South Dakota* v. *Opperman,* 428 U. S. 364, 396 (1976) (MARSHALL, J., dissenting).

I dissent.