**Bennie Lamount BROWN, Plaintiff,**

v.

**Joseph NICKERSON, et al., Defendants.**

**No. 4:92CV1890 CDP.**

United States District Court,
E.D. Missouri,
Eastern Division.

March 29, 1994.

Bennie Lamount Brown, pro se.

Timothy R. Huff, Niedner and Ahlheim, St. Charles, MO, Stephen M. Ryals, Daniel T. Dalton, Kessler and Soffer, Clayton, MO, for plaintiff Bennie Lamount Brown.

John J. Fitzgibbon, Office of City Counselor, St. Louis, MO, for defendants Joseph Nickerson, et al., individually and as Police Officer for City of St. Louis Police Dept., Joseph Brauer, individually and as Police Officer for City of St. Louis Police Dept., Robert E. Scheetz, individually and as Police Chief of City of St. Louis Police Dept. and David Robbins, James Conway, Nesby Moore, Jr. and Rita Krapf, individually and as members of City of St. Louis Bd. of Police Com'rs.

### MEMORANDUM OPINION

PERRY, United States Magistrate Judge.

This matter is before the Court for determination of certain non-jury issues which the parties stipulated should be determined by the Court following trial, and for entry of judgment on the jury's verdict. This case was referred to the undersigned for trial and all other purposes with consent of the parties pursuant to 28 U.S.C. § 636(c).

This 42 U.S.C. § 1983 case came on for trial on February 22, 1994. On February 24, 1994, plaintiff's claims regarding excessive use of force were submitted to the jury, and the jury returned verdicts for both defendants on those claims. The parties stipulated that plaintiff's claim that his confession

was obtained by coercion should be determined by the Court instead of the jury.

From the evidence presented at trial, the undersigned makes the following findings and conclusions:

### Findings of Fact

1. On January 30, 1991, Diane Binford was murdered in the City of St. Louis as she walked from the convenience store where she was employed to her nearby home. Plaintiff Bennie Lamont Brown, along with numerous other people, became a suspect in this murder because he lived in the area and had frequented the convenience store where the victim had worked.

2. On February 3, 1991, homicide Detectives Joseph Nickerson and Joseph Brauer, defendants here, questioned plaintiff about the murder. Plaintiff told the police he had been at his girlfriend's home babysitting her children during the time of the murder, which his girlfriend confirmed.

3. On February 25, 1991, at approximately 10:00 p.m., plaintiff was arrested by two other police officers for attempting to steal a car and for unlawful possession of a handgun. Plaintiff's resistance to that arrest resulted in the arresting officers' using force to arrest him. He suffered facial contusions and other injuries as a result of the arrest.[1] Two handguns were found in plaintiff's possession during this arrest. Plaintiff was given oral *Miranda* warnings at the time of that arrest.

4. On February 26, 1991, the homicide detectives learned that plaintiff was in custody and had been arrested in possession of a .38 caliber handgun. They knew the Binford murder weapon had been a .38 caliber, so they decided to question plaintiff again. Detective Brauer took plaintiff from the holdover cell at Police Headquarters to the homicide interview room in the same building. Detectives Brauer and Nickerson interviewed plaintiff on and off throughout the day, beginning sometime in mid-morning. They first again advised plaintiff of the *Miranda* warnings. Plaintiff's answers and story about the murder varied throughout the day. Initially plaintiff maintained his story

about babysitting. When told that the gun he had been found with was consistent with that used in the Binford murder, plaintiff told the police officers that he had in fact left his girlfriend's residence around the time of the murder to go to the store to buy beer. He testified that as he was walking to the store he observed an individual by the name of "Pookie" approach Diane Binford and shoot her three times. He stated he then followed Pookie as Pookie fled from the scene and observed him put two guns in plastic bags into the dumpster. Plaintiff stated that he took the guns from the dumpster, took them home and hid them under his car.

5. Upon hearing this story, defendants identified an individual who went by the nickname "Pookie" and who lived in the vicinity of the murder. At approximately 2:00 p.m. on February 26, 1991, they telephoned Pookie's house and spoke to Pookie's father, who indicated that Pookie was at work but would call them back at 5:30 p.m. When Pookie returned from work he called the police, then came down to the Homicide Department to be interviewed. He provided an alibi, which was confirmed by several other people. Confirming this alibi took until sometime in the early evening.

6. At some time during the day the police officers learned that the gun seized from plaintiff was in fact the murder weapon. At around 9:00 p.m. that evening the detectives again confronted the plaintiff with all of the evidence against him, including the gun and Pookie's alibi. After being confronted with all of the evidence plaintiff stated that he was tired of trying to put the blame on others and he would come clean with what he did. He then confessed to the crime. Defendants took a full statement from Brown orally and then asked if he would be willing to place his confession on videotape. He agreed to do so.

7. Before videotaping the confession the detectives again read Brown the *Miranda* warnings, including that he had a right to remain silent, that anything he said could be used against him, that he was entitled to have a lawyer present with him during questioning and before questioning if he desired

---

1. Plaintiff sued those arresting officers for violation of his constitutional rights and that case was tried to a jury before the undersigned in February of 1992, resulting in a verdict for defendants. *See* Cause No. 91–1416–C(7).

and that if he could not afford a lawyer one would be appointed for him at the government's expense. He was also informed that if he wished to stop answering questions at any time he could do so, and that if he wished to ask for a lawyer at any time he could do so. Plaintiff again stated that he understood these rights and agreed, again, to make these statements. He signed a written warning and waiver form to this effect. Thereafter he made a videotaped confession.

8. Neither defendant used any force, coercion, or threats to induce this confession. Both defendants testified that they never hit or struck or threatened to hit or strike plaintiff at any time when he was in their custody. Plaintiff contests this, and testified that the defendants struck, hit, and kicked him numerous times, especially on the face and head. The Court finds plaintiff's testimony to be not credible. Plaintiff is a highly incredible witness, both in his style of testifying and his demeanor. Plaintiff's counsel urged that plaintiff has some kind of a speech impediment that makes him difficult to understand and that the Court should not judge his credibility more harshly because of this communication difficulty. The Court agrees that plaintiff does have an unusual speaking style, but it is possible to understand what he is saying and he appeared to clearly understand both what he was saying and the questions that were being asked of him. His testimony, however, was internally inconsistent and logically unsound. Additionally, the mug shots taken of him on the night of February 25, 1991, (before he was questioned by the homicide detectives), when compared to his appearance in the videotaped confession, were entirely consistent. No new injuries appeared in the videotape. Instead, it can be clearly seen on the videotape that some of the injuries plaintiff suffered the night before during his arrest were beginning to heal over. If plaintiff had been beaten as he said he was, additional injuries would have been visible. Finally, plaintiff testified at trial that not only was his confession false, his earlier story regarding Pookie was also false, and the true facts of the murder, which he admits he did not reveal to the police on either February 3 or February 25, 1991, were that it was committed by two of the children whom he had been babysitting. He testified that the children had returned to the house, and confessed the murder to him on January 30, 1991, but he had not told the police about this because he did not know if it was true. Although this is a somewhat collateral matter to the issue of whether the February 25, 1991, confession was coerced, it is clearly additional evidence which can be considered by the Court in judging plaintiff's credibility. Plaintiff's testimony on this point, along with his testimony regarding being beaten by the interrogating officers, is simply incredible.

### Conclusions of Law

The Court concludes that plaintiff's testimony that he was beaten and that the confession was induced by threats and violence is not credible. The Court has specifically found that before any interrogation by these defendants, plaintiff was advised of his constitutional rights to remain silent and to counsel, as prescribed by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Plaintiff understood these rights and waived them, both orally and in writing. *Patterson v. Illinois*, 487 U.S. 285, 292–93, 108 S.Ct. 2389, 2394–95, 101 L.Ed.2d 261 (1988). The evidence shows that his confession was not the product of unlawful police coercion or inducement, and that it was voluntary. *See Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *United States v. Goudreau*, 854 F.2d 1097, 1099 (8th Cir.1988).

Thus, because the Court credits the testimony of the police officers that no force or threats were used, and because the Court finds the confession was made after plaintiff freely and voluntarily waived his right to remain silent, the Court finds there is no basis on which plaintiff could recover on his claim under the fifth and fourteenth amendments. Judgment accordingly will be entered on all counts of plaintiff's complaint in favor of the defendants.

A separate Judgment in accordance with this opinion and the jury verdict is entered this same date.