922 F.2d 841
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Margie MARCUM, Petitioner-Appellant
v.
James A. KNIGHT, Circuit Judge, 24th Judicial District of
Kentucky, Fred Cowan, Attorney General, Kentucky,
Respondents-Appellees
 No. 89-6192.
 United States Court of Appeals, Sixth Circuit.
 Jan. 8, 1991.
 
 Before MERRITT, Chief Judge, and NATHANIEL R. JONES and WELLFORD, Circuit Judges.
 MERRITT, Chief Judge.
 
 
 1
 Defendant appeals from a denial of federal habeas corpus relief under 28 U.S.C. Sec. 2254 (1988). We affirm.
 
 
 2
 Defendant and the decedent, her husband, were having a party at their mobile home. Both had been drinking heavily (defendant's blood alcohol level was .25 percent when tested after being taken to the police station approximately one hour after the homicide took place). The party broke up after the decedent became abusive toward one of the guests and threatened the guest with a knife. Bobby Marcum, the defendant's son, broke up the altercation and took the knife from the decedent. After all the other guests had left, he drove away from the premises. Defendants and the decedent were left alone at the mobile home. As Bobby Marcum was backing his car down the hill away from the mobile home (not within view of the home), he heard a gunshot. He returned to find the dead body of the decedent near the decedent's truck. He then left the scene to call the police.
 
 
 3
 The first two law enforcement officers to arrive were Martin County Deputy Sheriff Sonny Tiller and Kentucky State Police Trooper Lowell Ward. After examining the dead body, the two officers approached defendant, who was standing near the trailer. The events immediately thereafter are somewhat unclear. Tilley states that he told defendant that she did not have to say anything, but did not read her Miranda warnings. He stated that he did not read her Miranda warnings at that time because she was not a suspect. Defendant asked Tilley who he was; he answered he was a police officer. She then said, "I shot him, will you help me?"
 
 
 4
 Ward testified at trial that he gave defendant Miranda warnings as soon as Tilley and he first approached her, and then again after she confessed. In the motion to suppress, however, he stated that he read Miranda warnings to defendant only after she initially confessed. The Kentucky Court of Appeals, without comment, determined that defendant received no Miranda warnings until after she initially confessed. Although this conflicting testimony was not expressly resolved, defendant does not dispute that Miranda warnings were read to her after the initial confession.
 
 
 5
 In response to the reading of Miranda warnings after the initial confession, defendant addressed Ward and said, "Good, I don't want to talk to you." Thereafter, Ward testified that defendant later exclaimed, "I didn't mean to kill him." Ward stated that he did not say anything to defendant or ask her anything prior to her making the remark. Thereafter, defendant was arrested. As she was being placed in the police car by two policemen, she commented, "[i]f I had another gun, I would shoot you all too." There was some dispute whether she meant she would shoot both of them (i.e. "shoot you two") or whether she was again implicitly admitting to shooting the decedent (i.e., "shoot you too").
 
 
 6
 Prior to defendant's arrest but after the two confessions made to Tilley and to Ward, Deputy Andy Lowe questioned defendant. He testified that he gave defendant Miranda warnings immediately upon his arrival. When he first asked defendant who shot the decedent, she did not reply (apparently heeding the advice of a relative standing nearby who told her she did not have to say anything). After this relative walked away, Lowe again asked about the murder, to which defendant replied, "I shot the son of a bitch."
 
 
 7
 These events led to the conviction of manslaughter in the first degree. After losing an appeal to the Kentucky Court of Appeals and being denied federal habeas relief in the district court below, defendant appeals to this Court.
 
 
 8
 Both parties agree with the Kentucky Court of Appeals that the state trial judge violated plaintiffs' sixth amendment right of confrontation (applied to state proceedings through the fourteenth amendment) when the judge permitted a coroner's report to be introduced at trial without testimony from the coroner himself. Assuming that such a constitutional error did occur, we find it to be harmless error.
 
 
 9
 Chapman v. California, 386 U.S. 18 (1967), sets forth the appropriate standard for determining whether a trial court should be reversed for any constitutional error it may have committed: "before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt." Id. at 24. The State, as beneficiary of the alleged error, bears the burden of proving that there was no injury to defendant. Id. The Court has given some guidance in determining what errors may be deemed harmless. Relevant factors
 
 
 10
 include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.
 
 
 11
 Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).
 
 
 12
 At trial, plaintiff was allowed to introduce the coroner's death certificate to establish the cause of death as a "gunshot wound to the neck." Plaintiff argued to the Kentucky Court of Appeals that she was prejudiced because she would have liked to have questioned the coroner about his qualifications and about the possibility of suicide or death by knife wound.
 
 
 13
 Reviewing the facts, one finds that defendant did not really challenge the cause of death listed in the coroner's report. As the district court found, plaintiff
 
 
 14
 never attempted to introduce evidence or raise inferences at trial that the victim had been killed by anything other than a gunshot. Several police officers viewed the body and could easily have testified as to whether there were other wounds. Yet none of the other witnesses at trial were (sic) asked by the defense if the victim's throat was cut. The victim never took issue with the location of the gunshot wound.
 
 
 15
 The fact that the death certificate was marked to indicate homicide was not brought up by the prosecution. Nor was the certificate used as evidence of that act. Moreover, the petitioner never endeavored to show by any evidence that the death resulted from another cause. The possibility of suicide or accident was ruled out by evidence that the victim was not shot at close range (citation omitted). Therefore, the only reasonable alternative on the facts was homicide.
 
 
 16
 While the coroner's reliability could have been challenged, it would have served no purpose because the death certificate stated only facts which were not disputed by the defendant at trial....
 
 
 17
 Based on these facts, as well as defendant's confessions that she shot the decedent and Bobby Marcum's statement that he found the gun resting on the decedent, this Court finds, beyond a reasonable doubt, that the coroner's report, listing the cause of death as a gunshot wound to the neck, did not contribute to the verdict obtained.
 
 
 18
 Defendant next alleges that the trial court erred in admitting her confessions because they were not made "voluntarily." In effect, she claims that she was too intoxicated to make a statement sufficiently voluntary to satisfy the Due Process Clause of the Fourteenth Amendment. The facts surrounding each confession will be analyzed in turn.
 
 
 19
 The first confession occurred after Tilley approached defendant at the crime scene and asked her some general questions about what happened. There was no indication that she was in custody or that she was being interrogated at the time she uttered her first confession; accordingly, Miranda protection had not yet attached. In fact, Tilley had not given Miranda warnings to defendant, because he did not then consider her a suspect.
 
 
 20
 Defendant is like the defendant in Colorado v. Connelly, 479 U.S. 157 (1986), who walked up to a police officer, confessed to a murder, and later claimed that his confession was involuntary because he was suffering from delusions at the time he made the confession. Intoxication, like mental illness, cannot support a finding of involuntariness standing alone. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Id. at 167. "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." Id. at 165. As to the first confession, defendant's intoxication, in the absence of coercive police activity, does not make the confession involuntary.
 
 
 21
 The second confession, defendant's statement that she "didn't mean to kill [decedent]," was overheard by Officer Ward. At the time defendant made this statement, she undoubtedly was being interrogated and in custody; Miranda protections had attached. Ward read Miranda warnings to defendant and she replied that she did not want to talk to him. Ward testified that he asked her no further questions, that he left her for a moment, and that, upon his return, she spontaneously made the statement. Miranda dictates that an "interrogation must cease" when the person in custody indicates that "he wishes to remain silent." Miranda v. Arizona, 384 U.S. 436, 474 (1966). There is no suggestion that Ward failed to honor scrupulously defendant's request not to be questioned. Her decision to confess in front of him constitutes a valid waiver of her Miranda rights and is therefore admissible.
 
 
 22
 The third confession to Lowe did not add anything and was given after Miranda warnings. We agree with the Court below and the Kentucky courts that these incriminating statements were properly admitted.
 
 
 23
 Defendant also claimed her counsel was ineffective as a result of the State's failure to present her counsel with the name of an expert witness and a report of scientific testing until the day of trial. This expert testimony revealed that the gun used in the homicide had been fired at the victim from a distance of from 9 to 24 feet, which defendant suggests refuted her defense that she was acting in self-protection or that decedent died by suicide.
 
 
 24
 Pursuant to Kentucky Rule of Criminal Procedure 7.24(1) defendants had requested the names of all expert witnesses, lists of physical evidence, and reports and results of scientific tests. In response, the State stated that "crime laboratory personnel" would be testifying; the barrel and receiver of the shotgun would constitute the physical evidence used; and the results of all physical scientific tests conducted would be furnished to defendant as soon as the Commonwealth had the results within its possession.
 
 
 25
 The trial court accepted the State's reason for not giving the ballistics report to defendant earlier than the day of trial: the report was completed only that morning. The Kentucky Court of Appeals found that defendant was not prejudiced because she had sufficient notice that someone was going to testify from the crime lab about the gun. The state appellate court also pointed out that defendant questioned the witness extensively and gave no suggestion at trial that she planned to raise a suicide or self-protection defense. We find no evidence that defendant's representation by counsel was impeded by plaintiff's conduct and accordingly reject this ground for reversal.
 
 
 26
 Lastly, defendant claims that she was deprived of a fair trial in violation of the Due Process Clause of the Fourteenth Amendment when the prosecutor allegedly told the jury they could reject the intoxication defense. The incident to which defendant refers occurred when the prosecutor (in his closing argument) stated to the jury that he "[thought] theres (sic) a serious moral question as to whether or no (sic) theres (sic) any defense at all" based on intoxication. We conclude that, in context, this statement came within the bounds of permissible argument.
 
 
 27
 Accordingly, the judgment of the District Court is AFFIRMED.