TAYLOR, Judge.
The appellant, Brenda Lee Turley, was convicted of murder, a violation of § 13A-6-2, Code of Alabama 1975. She was sentenced to life imprisonment.
The state’s evidence tended to show that on September 17,1991, Cady Lynn Phillips, a seven-week-old infant, died at the Children’s Hospital in Birmingham, Alabama. An autopsy performed on the victim revealed extensive fractures of the skull, subdural hemorrhage, cerebral contusions, swelling of the brain, and hemorrhage of the thymus gland. The autopsy report stated that the victim died as a result of blunt force trauma to the head.
Lori Phillips, the victim’s mother, testified that on September 17, she and her three children — Angel Hodge, Keisha Phillips, and Cady Lynn Phillips — went to the appellant’s house. Turley’s two children, David and Candy, were at the house. Sometime in the afternoon the appellant asked Phillips to go to the store. She suggested that her husband, Donnie Turley, would take Phillips to the store while she watched the children. When Phillips left to go to the store, Cady was on Candy’s bed and Candy, Keisha, and Angel were in Candy’s bedroom. Phillips testified that when she returned from the store, Cady was in her car seat, which was on one end of the couch, and the appellant was seated at the other end of the couch feeding her son, David, who has cerebral palsy. She testified that she thought this was odd because the appellant usually fed David in his chair at the table. Phillips said she went to the table and started making sandwiches for the children and that Cady began to whine. According to Phillips, the appellant jumped up and grabbed Cady and said that she was choking on a penny. Phillips took Cady from the appellant, reached into her mouth, and retrieved a penny. Phillips said that she knew Cady could not pick up a penny and put it in her mouth. Cady began to turn pale. Phillips said that she went to telephone the paramedics but that the appellant would not let her use the telephone. Phillips then ran out of the house and to a nearby telephone behind the appellant’s house, from where she called paramedics.
Mel Colgrove, a paramedic with the Gadsden Fire Department, arrived on the scene and examined Cady. Mr. Colgrove testified that the Cady’s pulse was normal but that she was having difficulty breathing. Col-grove also testified that Cady was pale and lifeless.
After arriving at the hospital, Phillips notified the nurses that Cady’s head was swelling. Nurse Sylvie Maltby testified that she then felt Cady’s head and that it felt “crunchy” on both sides like a “crushed eggshell.” After being X-rayed, Cady was transported to the Children’s Hospital in Birmingham, Alabama, where she died later that same day.
Angel Hodge, the victim’s four-year-old sister, testified that she remembered being in the back room of the appellant’s house, coloring, when the appellant came in and got the victim and took her to her car seat. She also testified that she then heard the victim crying and that she peeked around the door. Angel testified that when she did so she saw the appellant hitting the seven-week old infant with a wooden toy and with her fist. Angel testified that the appellant saw her and threatened to kill her if she told anyone. Angel said that she was afraid and that she began to have bad dreams. Angel testified that she told her great-grandmother because she was afraid.
I
The appellant contends that the trial court erred in allowing into evidence testimony concerning a statement made by the appellant because, she says, the statement was induced by a promise or offer of reward. She also contends that although she was informed of her Miranda[1] rights she did not have the mental capacity to understand those rights when they were read to her.
*193 The appellant filed a motion to suppress the inculpatory statement and the circuit court held a suppression hearing on the motion, at which the following evidence was presented.
Officer Billy Phillips and Detective Sheila McClure of the Gadsden Police Department interviewed the appellant and testified at the hearing. Officer Phillips testified that he read the appellant her Miranda rights and that the appellant acknowledged that she understood her rights. Detective McClure then read an advisement of rights form to the appellant. Detective McClure told the appellant, “I’m going to read your rights. I want you to be able to understand each one of these rights. And if you have any questions you stop me and talk to me.” The appellant was also read her waiver of rights at the bottom of the form and acknowledged that she understood the waiver. She then signed the waiver form. Officer Phillips testified that the appellant appeared to understand her rights. Officer Phillips stated that he did not threaten or coerce the appellant in any way, and that he did not make any promises or inducements or give hope of reward to get the appellant to sign the waiver. He also stated that the appellant did not appear to be under the influence of any alcohol or drugs when she signed the waiver of rights form.
The appellant made the following statement:
“Donnie and Lori left to go to the store. Cady had been lying on the bed in Candy’s room. I brought her out before Donnie and Lori left so the kids (Angel, Keisha, and Candy) wouldn’t wake her up -with all the noise they were making. I laid her on the couch just as Donnie and Lori were leaving. I was cooking supper. Cady was whining. I went into the kitchen to fix her a bottle. I put it in the microwave and put the cornbread in the oven. I took the bottle out of the microwave and went to feed the baby. The bottle was too hot, so I went back and poured some more milk in the bottle to cool it off some. Baby, my other personality, was angry at me and jealous of Cady. I had been through a lot and just wanted everyone to leave me alone. Everyone was telling me their problems, and I didn’t want to hear it. Baby is devious, and don’t like people hurting her. She has a violent nature, and would tear up stuff and hit people. She even tried to get me to O.D. (overdose) that day, and when I wouldn’t, she got angry with me. She wanted to take care of the baby (Cady). She wanted to take care of all the babies. Every time she looked at Cady, it would remind her of Candy and when she was a little baby. Me and Baby couldn’t have any more babies, and Baby wanted Cady, but, her mother wouldn’t give it to her. Baby was very angry at Cady. She was jealous. Baby hit Cady three times on her head hard, with her hand. She didn’t do anything else to the baby or drop her, but when she came back into the room, Cady was [lying] on the floor between the couch and the chair face down. I picked Cady up off the floor and laid her on the couch. Later, I put her in the car seat and put her bottle in her mouth.”
Once the appellant finished her statement, the officers read the entire statement back to her. The appellant denied making parts of the statement and asked to see her husband. Officer Phillips talked with the appellant’s husband and informed him that he was placing the appellant under arrest for murder. Officer Phillips allowed the appellant to speak with her husband.
Donnie Turley, the appellant’s husband, testified that when she spoke to him after having made her statement, the appellant did not tell him that she needed an attorney or say anything about having been mistreated by the police officers.
The appellant admitted signing the advisement of rights and waiver form but said that she understood only a part of it. The appellant also testified that the officers advised her of her Miranda rights and that she understood them when they were read to her but that she was confused.
Dr. Krichev, a clinical psychologist, evaluated the appellant. The tests he administered revealed that the appellant had a “borderline range of intellectual functioning.” The tests showed that the appellant was *194 suffering from “diagnostical personality disorder” and that she exhibited a “passive dependent personality.” The tests indicated that the appellant would have below average coping skills when presented with a stressful situation. In his opinion, the appellant would look for the easiest way out of any stressful situation.
Diminished mental capacity alone will not render a confession involuntary. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 478 (1986); Baker v. State, 599 So.2d 60, 63 (Ala.Cr.App.1991); Holladay v. State, 549 So.2d 122 (Ala.Cr.App. 1988), aff'd, 549 So.2d 135 (Ala.1989), cert. denied, 493 U.S. 1012, 110 S.Ct. 575, 107 L.Ed.2d 569 (1989); Corbin v. State, 412 So.2d 299 (Ala.Cr.App.1982).
In Arnold v. State, 448 So.2d 489 (Ala.Cr. App.1984), this court held that a low IQ will not render a waiver invalid unless the IQ is “[s]o low that the person making the statement absolutely cannot understand his Miranda rights.” 448 So.2d at 490.
In this case, no rebuttal testimony was offered to the evidence that the appellant’s mental capability was below average. However, there was absolutely no evidence presented that the appellant’s mental capability was so low that she could not understand her Miranda rights. The appellant indicated that she understood these rights, and she signed a waiver of rights form. There was testimony that the appellant did not appear to be under the influence of alcohol or drugs, was not offered any reward, and was not threatened or induced to make a statement. The court did not err in receiving the appellant’s confession into evidence at trial.
II
The appellant also contends that her conviction should be reversed because of alleged prosecutorial misconduct. Specifically, she contends that the prosecutor in summation commented on evidence that had been excluded at trial.
No error appears in the record regarding closing argument and the appellant did not object to the arguments at trial. We will not consider a matter presented for the first time on appeal. Cotton v. State, 639 So.2d 577 (Ala.Cr.App.1993).
For the foregoing reasons, the appellant’s conviction is affirmed.
AFFIRMED.
All the Judges concur.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).