Curry-SC v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-029-CR

        STEVEN CHRISTOPHER CURRY,
                                                                                       Appellant
        v.

        THE STATE OF TEXAS,
                                                                                       Appellee
 

From the 82nd District Court
Robertson County, Texas
Trial Court # 94-10-15,622-CR
                                                                                                    

O P I N I O N
                                                                                                    

          Steven Christopher Curry, pursuant to a plea-bargain agreement, pled guilty to the offense
of capital murder. Tex. Penal Code Ann. § 19.03 (Vernon 1994). The court assessed
punishment at life in prison. Steven appeals on four points, each one asserting that the court erred
in overruling his pre-trial motion to suppress. We will affirm the judgment.
          Steven shot his parents, put their bodies in a closet, and set their house on fire to hide the
murders. During the investigation, he made several incriminating statements to the police. He
also made an oral and a written confession. On appeal, Steven complains that the court erred in
failing to suppress the statements and confessions. 
          Steven filed a motion to suppress, alleging that "any and all statements" were in violation
of Miranda v. Arizona,


 the United States Constitution, and the Texas Constitution. Several
witnesses testified at the hearing on the motion to suppress:
deputy michael glass
          Michael Glass, a deputy with the Robertson County Sheriff's Department, testified that
around 12:15 a.m. on September 18, 1994, he was dispatched to a reported house fire. The
volunteer firemen had not been able to determine if any occupants were in the house. A Chevy
Blazer was parked near the house. Over the course of an hour, Glass ascertained that Harold and
Angela Curry resided in the house with their seventeen-year-old son, Steven. He learned that the
Currys had two vehicles—the Chevy Blazer and a red Nissan truck. 
          Around 2:30 a.m., in an attempt to locate Harold and Angela, Glass contacted Steven at
his girlfriend's house. The Nissan truck was parked there. Glass informed Steven that his
parents' house was burning and asked him if he knew where his parents were. Steven told Glass
that his parents were in Humble visiting his aunt and uncle, Arthur and Sharon Curry. Glass told
Steven that he could come look at the burning house if he wanted, gave Steven his business card,
and left. Glass asked the sheriff's dispatcher to contact the aunt and uncle. The dispatcher spoke
with Sharon Curry, who stated that Harold and Angela were not in Humble and that it was very
unusual for Steven to be driving the Nissan truck.
          Joseph Porter, a state fire marshall, was called in to help determine the cause of the fire. 
Porter asked that Steven be brought to the scene to help him determine the layout of the house. 
Officer Keith Pettit was dispatched to the girlfriend's house to ask Steven to come to the house. 
In the meantime, Glass walked around the perimeter of the house which was still too hot to enter. 
About seventy to eighty feet behind the house, near a barn, Glass saw a pair of women's
eyeglasses lying on the ground. A short distance from the eyeglasses, he found a rubber glove. 
Inside the barn, Glass found what appeared to be the mate of the rubber glove. He also found a
six- to eight-foot concrete "burn pit" in which he saw partially melted miniblinds and what
appeared to be material from a terry cloth towel. 
          Steven, who was not yet a suspect, arrived at the scene around 6:20 a.m. with his
girlfriend, Misty Harris. Steven, Glass, and Porter sat in a patrol car while Porter asked Steven
questions in an attempt to ascertain the whereabouts of Harold and Angela. When Porter asked
Steven where his parents were, Steven answered that they were at his maternal grandmother's
house in Humble. Porter asked Steven how his parents could be out of town when both of the
family's cars were in Franklin. Steven did not know. When asked why he had not come earlier
to the house, Steven stated, "I didn't want y'all to make me look at something I didn't want to
see." 
          Glass asked Steven to accompany him to the back of the house, showed him the women's
eyeglasses, and asked Steven if he recognized them. Steven stated that he did not know whose
they were and had never seen them before. Steven returned to sit in his truck. Glass then took
Misty to look at the eyeglasses. She immediately identified them as Angela Curry's glasses. 
Steven's paternal grandparents, W.A. and Norma Curry, had arrived on the scene from Hearne. 
W.A. provided Glass with a photograph of Harold and Angela in which Angela was wearing the
eyeglasses. 
          Glass walked over to the truck where Steven had been sitting for about fifteen minutes. 
He read Steven his Miranda warnings at 6:50 a.m., and Steven indicated that he understood the
warnings. Glass told Steven that, because of the conflicting information Steven had given, he
thought Steven was lying. Steven stated that he wasn't lying. Glass stated that Steven was not
under arrest and was free to go. Steven remained seated in the truck for at least half-an-hour. At
that time, Glass asked Steven if he would accompany him up to the house. As Steven and Glass
approached the house, the volunteer fire chief called to Glass. Glass asked Steven to have a seat
in the patrol car. 
          Inside the house, Porter and the fire chief had found the burned remains of two human
bodies, lying side-by-side on their backs. Porter informed Glass that, because of the positions of
the bodies, the victims had not died accidentally in the fire. Materials that appeared to be terry
cloth and the plastic from a garbage sack were under one of the bodies. Glass returned to his
patrol car and asked Steven to step out. As Glass reached for his handcuffs, Steven "of his own
accord" turned his back towards Glass with his hands behind his back. Glass asked Steven if there
was anything he wanted to tell him. Steven said, "No." Glass told Steven to take a seat in the
patrol car. 
deputy keith pettit
          Keith Pettit, a Robertson County sheriff's deputy, testified that around 6 a.m. he was asked
to go to Misty's house and ask Steven to come to the scene. He witnessed Glass read Steven his
Miranda rights around 7 a.m. Around 9:15 a.m., while Steven was sitting in Glass' patrol car,
Pettit initiated a conversation with Steven who orally confessed to the murders. The State did not
seek to have this oral confession admitted.
deputy gerald yezak
          Gerald Yezak, a Robertson County sheriff's deputy, testified that he first saw Steven
around 6 a.m. at Steven's parents' house. Steven drove up in the Nissan truck with his girlfriend,
Misty. He asked Yezak, "Did you find my parents yet?" Yezak left the crime scene to take Misty
to the sheriff's department where she gave a statement.
          When Yezak returned to the scene, Steven was sitting in a patrol car talking with Officer
Pettit. Yezak got in the patrol car and asked Steven "what he knew about what was going on." 
Steven stated that all he knew was that his parents had left him a note that they had gone to
Houston. 
          Later that morning, Yezak was approached by Pettit who said that Steven had admitted to
killing his parents and burning the house to cover up the murders. Pettit told Yezak that Steven
needed to go to the bathroom. Yezak retrieved Steven from the patrol car and told him to urinate
in front of the car with his back to the road. When Steven finished urinating, Yezak asked him
"if he felt better now." Steven responded, "Yeah, now that I admitted to it, I do." Yezak and
Steven then walked around the perimeter of the house. Steven pointed to places in the rubble
where evidence was later recovered. In particular, he indicated that a barrelled-action .22 semi-automatic rifle would be found where a closet had been.
          Yezak testified that he and Ranger Ray Coffman read Steven his Miranda rights and tape-recorded his oral confession around 10 a.m. Steven also signed a card with written Miranda
warnings. Around 11:30 a.m., Steven gave a written statement at the sheriff's office. Yezak
testified that Steven was given Miranda warnings, that Coffman asked questions, and that he typed
Steven's answers as he gave them. Steven also gave written permission for the officers to search
the Blazer and the Nissan. 
ranger ray coffman
          Ray Coffman, a Texas Ranger, testified that he was asked to record Steven's oral
statement. He stated that Yezak read Steven his Miranda rights while the tape recorder was going. 
the confession
          Steven's recorded and written confessions state that he was angry with his parents. On
Friday morning, September 16, he retrieved a .22 rifle from his parents' closet and loaded it with
eighteen live rounds. Around 1:30 p.m., while his mother was sitting on the back steps smoking
a cigarette, Steven shot her in the head through the kitchen door. Because she was "hollering,"
Steven shot her again in the head. He wrapped her head first in a towel and then in a plastic
garbage sack. He dragged the body into a storage closet. Steven retrieved a gas can from the
barn, drove to Franklin, bought gasoline, and returned home. He collected a bloody towel, a door
mat, and the miniblinds from the kitchen door. He put them in the concrete pit in the back yard
and burned them.
          Around 6 p.m., Steven's father arrived home. As his father entered the kitchen, Steven
aimed the rifle at his chest and fired "about five times." Steven shot his father "one more time
almost directly between the eyes and he stopped hollering." He returned the rifle to his parents'
closet. He then wrapped his father's head in a towel and a garbage sack, put his father's body in
the storage room next to his mother's body, and locked the door. Steven left the house and went
to the movies with his girlfriend, Misty. He spent Friday night at Misty's house.
          On Saturday, Steven spent the day watching rental movies and visiting Misty's
grandmother's boyfriend in the hospital. He returned to his parents' house around 10:15 p.m.,
poured gasoline throughout the house, and lit the fire. He then went to Misty's house to spend
the night.
POINTS OF ERROR
          All four of Steven's points assert that the court erred in overruling his motion to suppress
the confessions. In a hearing on a motion to suppress, the trial judge is the sole and exclusive trier
of fact and judge of the credibility of the witnesses as well as the weight to be given to their
testimony. Romero v. State, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). If the court's
resolution of a controverted issue is supported by the record, a reviewing court should not disturb
that decision. Muniz v. State, 851 S.W.2d 238, 252 (Tex. Crim. App.), cert. denied, — U.S. —,
114 S.Ct. 116, 126 L.Ed.2d 82 (1993). We limit our review of the trial court's rulings, both as
to the facts and the legal significance of those facts, to a determination of whether the court abused
its discretion. See DuBose v. State, 915 S.W.2d 493, 496 (Tex. Crim. App. 1996). Even if we
would have decided the issue differently, we will not intercede if the court's ruling was within the
"zone of reasonable disagreement." Id. at 496-97.
          Steven's first point asserts that the court erred in failing to suppress his oral and written
statements because he had invoked his right to remain silent. Glass read Steven his Miranda rights
shortly before 7 a.m. Steven indicated that he understood his rights. Glass told Steven that he
thought he was lying. Steven denied that he was lying. Glass left Steven alone in his truck for
over half an hour. After the bodies were found, Glass handcuffed Steven and asked him if there
was anything he wanted to tell him. Steven answered, "No." He asserts that the latter was an
invocation of his right to remain silent. 
          Prior to any questioning, a person must be warned that he has a right to remain silent, that
any statement he does make may be used as evidence against him, and that he has a right to the
presence of an attorney, either retained or appointed. Miranda, 384 U.S. at 444, 86 S.Ct. at
1612. A defendant may waive these rights, provided the waiver is made voluntarily, knowingly,
and intelligently. Id. If the defendant "indicates in any manner" that he does not wish to be
interrogated, the police may not question him. Id.
          The threshold question is whether Curry exercised his right to remain silent. Murphy v.
State, 766 S.W.2d 246, 249 (Tex. Crim. App. 1989). "There need not be a formal invocation of
constitutional or Miranda rights. Anything said or done by the defendant that could reasonably
be interpreted as a desire to invoke these rights should be sufficient to halt questioning." Watson
v. State, 762 S.W.2d 591, 598 (Tex. Crim. App. 1988). Whether a defendant invoked his right
to remain silent is decided on the totality of the circumstances on a case-by-case basis. Id. at 597.
          Prior to receiving his Miranda rights, Steven seemingly cooperated with the investigating
officers in their attempts to locate his parents. He spoke with several officers and accompanied
Officer Glass around the perimeter of the house. Glass read Steven his Miranda rights around 7
a.m. and he indicated that he understood the warnings. Steven did not invoke his right to remain
silent; rather, he continued to speak with Officer Glass and denied that he was being untruthful
and repeated that his parents were in Houston. Steven had been left alone in his truck for half an
hour when Glass asked him to accompany him into the house. Glass and Steven were about to go
into the house when the bodies were found. 
          When Glass handcuffed Steven, he asked Steven "if there was anything he'd like to tell me
and he said, `no.'" Glass did not ask Steven any further questions. Glass stated that he did not
think Steven wanted to talk to him, "Sometime the investigator and a witness or suspect or
whatever just don't click." Glass further testified, "[Steven] didn't say he didn't want to talk
anymore. He was answering a question I asked." Officer Pettit testified that he had observed
Steven being administered his Miranda warnings. He testified that he was not aware of Steven's
statement to Officer Glass. Steven's initial comments to Officer Yezak were in response to
Yezak's question, "Do you feel better?"
          Reiterating the standard of review, the trial judge is the sole and exclusive trier of fact and
judge of the credibility of the witnesses as well as the weight to be given to their testimony. 
Romero, 800 S.W.2d at 543. If the court's determination is supported by the record, we should
not disturb that decision. Muniz, 851 S.W.2d at 252. In the context of the morning's events,
Steven's actions and statements, and Officer Glass' testimony, the trial judge did not find that
Steven's statement to Officer Glass was an invocation of the right to silence. We cannot say that
the court's ruling was outside the "zone of reasonable disagreement." DuBose, 915 S.W.2d at
497. We overrule point one.
          In his second point, Steven asserts that the court erred in failing to suppress his statements
because he had not affirmatively waived his right to remain silent and to have legal counsel. 
Steven concedes that he was given Miranda warnings prior to his giving his recorded statement
and his written statement. However, he argues that he never made an "affirmative statement"
waiving his rights. 
          The transcription of Steven's recorded confession reveals that he was read his statutory
rights. He affirmatively answered that he understood those rights. His written statement contains
a paragraph of the required warnings. He initialled the paragraph. Directly following the
warnings paragraph, the statement contains the following paragraph:
Prior to and during the making of the statement, I have and do hereby knowingly,
intelligently, and voluntarily waive the above explained rights and I do make the following
voluntary statement to the aforementioned person of my own free will and without any
promises or offers of leniency or favors, and without compulsion or persuasion by any
person or persons whomsoever.
Steven initialled the waiver paragraph. Thus, we believe that the State established by a
preponderance of the evidence that he waived his constitutional and statutory rights. Colorado v.
Connelly, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); see also Garcia v.
State, 919 S.W.2d 370, 387 (Tex. Crim. App. 1996) (on rehearing). We overrule point two.
          In his third point, Steven asserts that the court erred in failing to suppress his unrecorded
statement to Officer Yezak concerning the location of the murder weapon. An unrecorded oral
statement of an accused may be admissible if the statement "contains assertions of facts or
circumstances that are found to be true and which conduce to establish the guilt of the accused,
such as . . . the instrument with which he states the offense was committed." Tex. Code Crim.
Proc. Ann. art. 38.22, § 3(c) (Vernon Supp. 1996). Steven argues that there is "no evidence that
any fact in the statement was later found to be true."
          Steven told Officer Yezak that he had returned the murder weapon to his parents' closet
after the shootings. He pointed to the general area of the rubble where the rifle would be found. 
Yezak told another officer where to look for the weapon. Yezak testified that the weapon was
found "right where he said it was." We overrule point three.
          In his final point, Steven asserts that the court erred in failing to suppress his unrecorded
statements about the eyeglasses found behind the house. He argues that the State sought to
introduce the statements under article 38.22, section 3(c) and that the State failed to show that the
statement was "true." Id. The constitutional and statutory rights to remain silent apply only to
statements made to the police as a result of custodial interrogation. Miranda, 384 U.S. at 444,
86 S.Ct. at 1612; Tex. Code Crim. Proc. Ann. arts. 38.22, 38.23. At the point in time when
Steven made the statements about the glasses, no crime had been discovered and he was neither
a suspect nor in custody. The court did not err in failing to suppress the statements. We overrule
point four.
          Having overruled all of Steven's points, we affirm the judgment.
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Justice Cummings,
          Justice Vance, and
          Chief Justice McDonald (Retired) 
Affirmed
Opinion delivered and filed July 25, 1996
Do not publish