[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION: MOTION TO SUPPRESS STATEMENTS
 BEFORE: THE HONORABLE JOHN F. MULCAHY, JUDGE
APPEARANCES:
STATE OF CONNECTICUT:
 John F. Fahey, Esq., Assistant State's Attorney Robin Cutuli, Esq., Deputy Assistant State's Attorney
DEFENDANT:
John Watson, Esq., Public Defender
 Transcribed by Therese J. Albert Court Monitor
THE COURT: Good morning. This is State v. Stevie Clark. Mr. Clark is present in court with counsel, and we have all of the attorneys present. We do have the jury coming in today. I believe we told them to come in at a quarter to eleven or thereabouts. Before we proceed, however I've got a rather lengthy presentation with reference to my findings on the motion to suppress the statement. I had deferred these findings for the simple reason that we wished to start the evidence, and there were a couple of delays that were occasioned. So rather than take the time, a little earlier on in the trial it was agreed with counsel that I would defer putting my findings on the record. We have reached the point now where I suspect the State will be offering certain CT Page 4617 if not all of the statements made by the accused. So consistent with our earlier discussion, I'll put my findings re: the motion to suppress on the record.
First off, were dealing with the motion to suppress the oral statements of the accused, Stevie Clark. I believe that motion, although I don't have it front of me, was dated and filed on April 11, 1997. With respect to the motion to suppress the oral statements of the accused person, Stevie Clark, the Court conducted and evidentiary hearing on the motion. The Court has also reviewed its detailed, copious notes of the evidence presented during the course of the hearing. The Court listened, of course, very carefully to the arguments of counsel at the conclusion of the evidence on the motion, and the Court has reviewed thoroughly the memorandum of law submitted by the defendant with respect to the instant motion. I've also carefully reviewed the pertinent authorities, including those cited in the memorandum that I've just referred to and also cited by the State and by all of the parties during the course of the oral argument. And with respect to the defendant's memorandum of law, I think I should state at the outset that the Court generally accepts the statements contained therein as to the pertinent law which has application to this case, and I would also conclude, after having studied the memorandum, that it does not differ materially from the States recitation, at least, of legal authority that have application here. I think both the defense and the State rely on essentially the same legal precedents. Obviously, the parties disagree with reference to the consequences resulting from the application of those precedents and, also with reference to the factual conclusions that should be drawn from the evidence presented. I'm not going to restate in any detail the legal principles. They've all be discussed thoroughly on the record, and as stated, they're set forth in the defendant's brief. I would simply state that I believe were all in agreement, as was set forth on the record at the time of the hearing, with respect to the pertinent standard of proof that relating to proof by a preponderance of the evidence.
Essentially, the instant motion, in my view, addresses three oral statements of the defendant to the police on June 25/26, 1996. First, there was the statement that was made from up in the tree, a second statement while the defendant was on the ground at the base of the tree, and then a third statement at headquarters, later on that evening, or more accurately, in the early-morning hours of April 26th. It is agreed, and the Court so finds, that CT Page 4618 the defendant was in custody at the time each of the three statements were made. At all relevant times, as I understand it, the defendant was eighteen years of age. The Court will not detail the facts, most are not in dispute, but I do feel I have to go through certain of the general facts established by the witnesses.
All of the witnesses were New Britain Police Officers, and the Court feels for purposes of the record a somewhat detailed sketch of what generally occurred based, as I see it at least, based on my consideration of the evidence is necessary to place the incident in factual content.
At about 10:20 p. m. on June 26, 1996, the New Britain Police were dispatched to the area of 66 Richard Street, apparently in the Mount Pleasant housing project on a report of shots fired, person on the ground. On arrival, one John Bazemore was found lying in the street, gunshot wounds to the face, more specifically, the jaw area and also the chest. An initial officer on the scene was — one of the initial officers on the scene was Officer Steck, who knew both Bazemore and the defendant from prior police dealings. Apparently Officer Steck had arrested the defendant once in the past and had had many past contacts with the defendant and Bazemore, the officer having been previously assigned as an officer in the housing unit at various projects including Mount Pleasant project. When. the officers arrived, a large crowd proceeded to gather in the area where the victim, Bazemore, lay in the street. Information developed by the police implicated the defendant as a suspect in the shooting. Officers, including Officer Steck, went to the defendant's mother's house at, I believe it was, 122 Richard Street looking for the defendant. They did not find the defendant there. At some point, a canine was brought to the area of the mothers house and through the canine the defendant was tracked to a tree a short distance away. A number of officers apparently assembled at the base of the tree, and looking up in the tree with a light, several officers observed the defendant in the tree and ordered him down. According to Officer Steck, the defendant blurted out, while in the tree, I did it; I shot John. The officer stated that this utterance or that that utterance was not made in response to any questions or interrogation. The defendant was told to come out of the tree. All three officers at the base of the tree — or all of the officers at the base of the tree apparently had their guns drawn and the canine officer had informed the defendant that if he tried to run when he came down that the canine officer would CT Page 4619 release the dog and the defendant would be bitten. Defendant expressed, at that point, some considerable concern regarding the dog, said he would not run and asked that the officer keep the dog back, and the defendant was told that he was under arrest. On the ground the defendant was placed face down and handcuffed, hands behind his back. He was told that he was under arrest, as stated, and Officer Steck advised him of his rights. He did not read off the card but he did advise him of the usual rights: that he was under arrest; that he had the right to remain silent; that anything he said could and would be used against him in court; that he had the right to an attorney, and Officer Steck said that he specifically advised him that he shouldn't say anything — make any statement or say anything.
The defendant indicated that he wished to cooperate; that he wished to have his side of the story known. Steck, apparently while the defendant was on the ground, asked him where the firearm was. The defendant said that it was in a tree or a bush near his mothers residence, and when the officers looked there, apparently later, for the gun, it was never found or recovered.
The crowd that had gathered moved, apparently, over. towards that general area. Apparently, there was an air of some considerable hostility. The officer indicated that certain of the hostility was directed towards the defendant. In any event, the officers became concerned, radioed for a marked vehicle to transport the defendant to headquarters. The cruiser came on the scene, although not directly in Mount Pleasant or at the tree, but up the hill at a dead-end street named Fern Street, apparently, adjacent to the Mount Pleasant complex, over by the Benjamin Franklin School. Officer Steck and other officers walked the defendant, the handcuffed arrestee, up the hill to Fern Street and there were actually two, one on each side of the defendant, the defendant having his hands cuffed behind his back and then several other officers also walking close by but not up close to the defendant.
When they reached the cruiser, the defendant was placed in the back seat and the two officers who had brought the cruiser over, Flynn and Masternak, I believe it was, they were sitting in the front seat with the defendant cuffed in the back seat and they transported him immediately to the headquarters.
From the time of the statement of the defendant at the base of the tree concerning the location of the firearm until he was CT Page 4620 interviewed later at headquarters by Detective Baden and Officer Steck, there were no statements by him, no conversations regarding the incident at all; that is the shooting; that is, from the point of the base of the tree to the time the formal interview began back at headquarters.
Detective Michael Baden was called at his home to come to headquarters to assist in the investigation of the Richard Street shooting. He arrived at headquarters, he testified, just before midnight and he was assigned to interview the defendant along with Officer Steck on that — I guess it would be, at that point, the very early morning hours of June 26, 1996. Detective Baden, during the course of the interview, was the primary interviewer. The a interview began about 12:05 a.m. on June 26th in an interview room in or near the Youth Division on the first floor of the New Britain Police Headquarters. The detective testified credibly, in my view, that defendant was awake. Apparently, he was not restrained; he was alert; he was coherent, eighteen years of age, no physical injuries or bruises were apparent, and the defendant never complained of any. He never requested anything to eat or drink but was given a soda and he did not request to use the lavatory facility. The detective read the defendant his rights from the notice of rights form, which was marked as an exhibit in evidence for purposes of the hearing on the motion to suppress. The detective went over each of the rights with him and asked him if he understood each right. Also, had the defendant read each right to himself, after he had read the first right out loud so that the officers knew he could read English. The defendant was asked if he had any question on each right, and the only right on which he had a question was that which is enumerated or denominated as number six, which pertained to bail terms and conditions of release, which Detective Baden then explained to him and the defendant indicated that after the explanation he did then understand number six. The defendant initialed all of the rights upon stating that he understood each right. He then signed at the bottom of the notice form, acknowledging that he had been advised of his rights. He received a copy of the notice, and the notice stated in writing that he was willing to waive his rights at that time and that no threats or promises had been made to him. He also initialed that statement which was written in to the waiver of rights form; that is, that he waived his rights and that no threats or promises had been made to him.
After the defendant executed the notice form and waived his CT Page 4621 rights, he agreed to a test which, as I understand it, is a powder deposit detection test. I think we referred to it as the "atomic absorption test" and when he agreed to that, they did then perform that test on his hands — in any event, on him in the interview room. After that was completed, the defendant then gave Detective Baden and Officer Steck a generally narrative oral statement in which he stated that he shot John Bazemore and set forth the details leading up to the shooting, the details of the shooting and the details following the shooting. The interview as not one of question and answer; that is, where the officers directed specific questions to the defendant. and the defendant answered them, but rather, it was more of the defendant's narrative to the general questions that the officer set forth, such as: Tell us what happened or then, what happened, questions of that nature. In other words, the statement was generally in narrative form by the defendant with the officers interrupting at any point if they had a specific question on any particular detail or wanted any clarification or more detail at any point. The general content of the statement, while not repeating it all now, is that the defendant shot Mr. Bazemore but that, in the defendant's view, Bazemore's conduct served as such to — served, perhaps, to provoke the particular shooting.
The statement was not reduced to a final writing for the defendant to sign because at about 1:12 a.m. the officers were advised that an attorney was calling to speak with the defendant and the interview was immediately terminated. And during the interview, it should be noted that the defendant, after being fully advised of his rights and executing the rights form and the waiver thereof, the defendant never stated that he wished to speak with an attorney or that he wished to have an attorney present during the interview.
First off, regarding the statement in the tree; that is, while the defendant was up in the tree, the Court finds Officer Stecks testimony, along with that of the other officers, but specifically Officer Stecks testimony, to be entirely credible and finds that the statement by the defendant was, in fact, made. While other officers did indicate that they either did not hear or did not recall hearing the defendant making that particular statement, there was testimony that the defendant and Officer Steck, as I stated, knew one another. There was also testimony that there was some degree of commotion at the bottom of the tree. Apparently, the dog was barking and, as one officer put it, the dog was going berserk and the other officers were occupied CT Page 4622 and concerned with the safety, their own, and the safety of all concerned. They did not know the man in the tree or really know anything about them, but they knew there had been a shooting and that, apparently, this person was wanted for the shooting. So that the conversation, the statement was, while I think it is credible, it was heard by Officer Steck, very probably the person to whom it was directly made and the person who knew the defendant and the defendant knew him. Now, that is not to suggest that there is not an issue of credibility in that regard presented. There certainly is, and I can only say that from the totality of the circumstances, based on the evidence as I heard it, that I am satisfied, applying the required standard, that the officer's testimony was entirely credible, that the statement was made and that it was heard by Officer Steck. And as I've stated, given the commotion, noise and individual involvement of the other officers at the bottom of the tree, it is understandable, in my view, that the comment was not overheard by all of the other officers.
Clearly, at the time the statement was made, in my view, the defendant was in custody. Custody means an arrest or a deprivation of an individuals freedom in any significant way. And I refer to State v. Brown, 199 Connecticut. However, spontaneous and voluntary remarks made in the absence of any interrogation are not made in violation of constitutional provisions, including the Fifth Amendment. Interrogation, of which there was none with respect to this statement, includes any words or actions on the part of the law enforcement officers which they should know are reasonably likely to elicit inculpatory remarks by a defendant or a suspect. And I'm referring to the language in the Burak case, in201 Connecticut. Spontaneous and voluntary remarks made by an arrestee in the absence of any interrogation are admissible without regard to compliance with Miranda, State v. Copeland, 205Connecticut and State v. Dixon at 25 Connecticut Appeals. So that the Court finds that the statement of the defendant while he was in the tree was spontaneous and voluntary. That while he was in custody, it did not involve responses to interrogation and, accordingly, the Court finds that that is admissible.
With reference to the post-Miranda advisement statements, there are two: the one at the base of the tree and the other station house statement of the accused. First, with reference to the legal principles which pertain, all of which counsel have referred to at length in the oral argument on this motion, our courts have stated that the purpose of the Miranda warnings is to CT Page 4623 assure that a confession is the product of an essentially free and unconstrained choice by its maker. And as authority for that, need look no further than the Madera case in 210 Connecticut. In accordance with the well established test of Johnson v. Zerbst, a defendant must intentionally relinquish or abandon his Miranda
rights in order for a waiver of those rights to be valid, and the State bears the burden by a preponderance of the evidence that the defendant knowingly and intelligently and voluntarily waived his Miranda rights. That almost goes without citation, but in any event, the Court refers to State v. Stanley at 223 Connecticut: When considering the validity of a claimed waiver, courts examine the totality of the circumstances surrounding it. Again, that was established in Madera and factors used to assess the totality of the circumstances include the age of the accused, the extent of his education, evidence concerning advisement of constitutional rights and the length and nature of the interrogation. And I would simply refer to State v. Toste, 198 Connecticut. And, of course, aside from the Miranda issue, the Court must determine whether or not the State has established that the defendant's statements to the police were voluntary. And in its inquiry into the voluntariness of the defendant's statements, the Court, of course, applies the test of Colorado v. Connelly, 479 U.S. 157, a 1986 case. And looking at the totality of the circumstances, the Court considers whether the conduct of the police caused the defendant to have been overborne and whether his capacity for self determination was critically impaired and State v. Barrett
at 205 Connecticut. Notwithstanding the due process of law prohibits the State from using any involuntary confession at trial and the State has the burden of proving voluntariness of a confession by a preponderance of the evidence. And again,Colorado v. Connelly and State v. Smith at 200 Connecticut, 465. Unless that burden is met, a confession compelled by pressure from police is inadmissible. The question of voluntariness is one of fact for determination by the Court; that is, the trial court, in the exercise of its discretion and subject to the constitutional standards of due process, State v. Derrico at 181Connecticut. Coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the constitutional provisions. If that predicate exists, then it is necessary to ultimately determine whether the confession is the product of an essentially free and unconstrained choice by its maker; that is, whether the confessor's will has been overborne and his capacity for self determination critically impaired so that the use of the confession offends due process. CT Page 4624
Here, the defendant was advised of his rights before any interrogation took place. He was advised at the base of the tree and then, of course, later, shortly afterwards at the station house. The State points out the statement at the base of the tree as to the location of the firearm was post-Miranda warnings and after Officer Steck had advised the defendant of his Miranda
rights while the defendant was handcuffed on the ground at the base of the tree. After that and after having been fullyMirandized, he, the defendant, indicated that he wished to cooperate, which is what he had indicated all along. And after being advised of his rights, he expressed the wish to cooperate. There is no indication or basis, in my view, for concluding that he did not understand his rights. He was eighteen years of age; he understood and spoke English. There is evidence that he had had some prior involvement with the law. There is certainly no evidence presented that he was below average intelligence and the evidence, in my view, showed that he was not under the influence of liquor or drugs and that he was not in any way threatened by the police. He specifically stated he wished to cooperate after having been advised of his Miranda rights by Officer Steck and the evidence, in my view, supports a conclusion that he was advised, that he understood the advisement, that he expressed a willingness to speak, all evidencing, in my view, a knowing and intelligent and voluntary waiver by the defendant.
The factors considered in assessing the totality of circumstances for purposes of determining voluntariness include many of those used in determining the capacity of the defendant to waive his Miranda rights knowingly, intelligently and voluntarily. In that regard, I would refer to State v. Huckaby, in 47 Connecticut Appeals. Again, with reference to voluntariness, the defendant received his rights he stated he wished to cooperate and he expressed wanting his side of the event, his version, to be known. While there was certainly police presence at the base of the tree, there were a number of officers around the defendant was lying on the ground face down, handcuffed; nevertheless, he did indicate that he wished to cooperate. And considering all of the circumstances, including age, absence of any threat or promise, the defendant's not being under the influence of any substance, prior contact with law enforcement authorities and all of the other relevant factors constituting the totality of the circumstances, I cannot conclude on the evidence that any conduct of the police caused the will of the defendant to have been overborne or that his capacity for self determination had been cricitally impaired. In my view, CT Page 4625 considering the totality of all of the circumstances, the evidence supports an opposite conclusion and, accordingly, I find that the statement at the base of the tree was a voluntary statement under the law. I have carefully reviewed the decision in State of Connecticut v. Roseborough and, specifically, at 221Connecticut 430, pages 443, and 444, and that's a 1992 decision. And it's my view that based on the evidence, the standards for voluntariness have been satisfied both under federal and state constitutional standards.
Going on, then to the station house statement, much of the same analysis, of course, pertains. But here, of course, there is the exhibit, the notice of rights form and the written waiver of rights. As to the interview at the New Britain Police Station, that occurred, as I've indicated, in an interview room near the Youth Bureau section of the police department building. Again, the Court finds the testimony of Officer Steck and Detective Baden to be entirely credible and reliable. Again, the standard of proof is the preponderance of evidence and there must be the advisement of the Miranda rights, which there was here, all of which I set forth on the record earlier. And the waiver of theMiranda rights must be intelligently, knowingly and voluntarily made, and the Court finds that it was. And then, of course, the Court must proceed to consider the issue of voluntariness based on the totality of the circumstances.
With reference, first, to the Miranda rights, the Court finds that he was advised; the Court finds that he did understand the rights; the Court finds that he initialed each rights, that he indicated, he demonstrated that he could read the rights in English, but in any event, they were read to him. He indicated that he understood them and he then signed the waiver form. And he indicated again, as he had all along, that he wished to cooperate and then did cooperate by giving a full statement regarding what led up to the shooting, the actual incident itself — the shooting incident itself and what followed. Under Toste, the factors are all set forth. With reference to those factors, there had been a prior arrest of the defendant. He had the ability to read in English and did read the rights. There's no indication, in my view, no credible evidence that he was under the influence, that he was in any way intoxicated. There's no indication — under the influence of either liquor or drugs or marijuana — there is no indication of any bruises or anything of that nature, that he was deprived of any food or anything of that nature. The evidence did indicate that he seemed calm and CT Page 4626 collected, that he was coherent and he appeared to comprehend what was taking place. And it is true that at one point, very briefly, apparently, down by the interview room in the Youth Bureau, he did begin to cry, but it was very briefly. He regained his composure very quickly and there is no indication, in my view, that his emotion was such that he could not thoroughly comprehend just exactly what was going on and what he was doing in reading and signing and initialing the waiver of rights form. So that the Court notice also refers to the Northrop case in 213Connecticut, and the court there indicated that where you have a written waive, that certainly is a strong indication that there was an understanding of each and every right was given to him. So that based on, again, all of the factors involved, the Court will find that the defendant did knowingly, voluntarily and intelligently waive his Miranda rights at the station house.
The Miranda requirements having been found to be established, then, of course, we proceed under Madera to the issue of voluntariness. The Madera case at 210 Connecticut and all of the factors are set forth in that and innumerable other cases which are to be considered or are among those to be considered in determining from the totality of the circumstances whether or not the statement was voluntary. of course, the critical element is that of police coercion and from the credible evidence, I cannot find that with reference to the taking of the station house statement after the Miranda rights having been fully given and after there having been a knowing, intelligent and voluntary waiver of the those rights, I cannot find from the credible evidence presented that there was any element of police coercion. The length of the interrogation, actually, was quite brief. Taking the interview in total, it runs from just after midnight to, roughly, 1:12, 1:15 a.m. and, actually, the entire detention was quite brief, from about 10:30 p. m., roughly, to about 1:15 a.m. — 1:12, 1:15 a.m. With reference to the location of the interrogation room, it was in the Youth Division at headquarters in a standard interrogation room, eight by six feet, as stated. The method of the interrogation here, there was not a lot of questioning or, so to speak, cross examining of the defendant. It was quite the contrary. As I indicated earlier, the statement was taken, primarily, in narrative form: Then what happened, and so on. The statement ended rather — well, actually, I guess they had taken a brief break but it was at that point that the police were advised that a lawyer was calling the defendant, telephonically, and at that point, the interview ended and no further questioning took place. And the interview was ended. And CT Page 4627 as I indicated, at no time had the defendant ever indicated to the police that he wished to talk to a lawyer, that he wanted a lawyer present or that he did not want to give any statement or tell what had happened. Quite the contrary. He indicated right from the very beginning that he wished to cooperate and have his side of the story or his version of the events known.
With reference to the suspects condition, again, I think the credible evidence established that he appeared calm, collected, very cooperative and that there was no indicia of ingestion of any drugs or alcohol. With reference to this physical condition, there were no visible bruises or injuries. He did not complain of any. As stated, there was a full Miranda warning prior to the giving of the statement and there were no threats or promises made by the police. To the contrary, the defendant repeatedly expressed his wish to cooperate. The defendant was eighteen years of age; there is no indicia of below or — that he was of below average intelligence. Thus, based on the totality of the circumstances in applying the required legal standard, the Court finds that the statement given at the station house to the police by the defendant was voluntary. That finding is made, again, after having read very carefully the Roseborough case, which I cited earlier in my remarks and that finding of a voluntariness is both for purposes of the requirements of the federal constitution and the state constitution. Accordingly, the motion to suppress the oral statements of the accused is denied and for purposes of any appeal in the event of a conviction, the court stenographer may transcribe all of my remarks concerning the ruling on the motion to suppress and those remarks will become my memorandum of decision on the defendant's motion to suppress and, again, pursuant to the Practice Book rule, if and whey they are transcribed, they are then presented to me for my signature and that will become my memorandum of decision.
MR. WATSON: May I just place two other matters, your Honor, on the record. Number one, last week, the States attorney mentioned he had not, up to that time, received medical records which he was aware that I was considering placing or offering in evidence. I have, this morning, provided to him a substantial packet of medical records and I will put on the record, as I've said to him, I will not be claiming them in their entirety, but I felt he should
 CERTIFICATION
CT Page 4628
I hereby certify the foregoing is a true and accurate partial transcript, taken by me, in the matter of State of Connecticut v. Stevie Clark, docket number CR6-162754, heard before the Honorable John F. Mulcahy, Judge, of the Judicial District of Hartford/New Britain on the 13th day of July, 1998.
Dated this 29th day of March, 1999, at Hartford.
Therese J. Albert Court Monitor
John F. Mulcahy, Judge