

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00464-CR

JOSE ANGEL SARMIENTO                                                          APPELLANT

V.

THE STATE OF TEXAS                                                                    STATE

----------

### FROM THE 271ST DISTRICT COURT OF WISE COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

In two points, Appellant Jose Angel Sarmiento appeals his convictions for capital murder and attempted capital murder. We will affirm.

### II. BACKGROUND

Sarmiento entered Bettie Walker's residence early in the morning on December 18, 2005, and shot her; Lydia Walker, Bettie's granddaughter; and

---

[1]*See* Tex. R. App. P. 47.4.

Jessica Corsbie, Lydia's friend. Bettie died from complications caused by a gunshot wound to her chest, but Lydia and Jessica, who were each shot in the leg, survived. Police questioned Sarmiento immediately after the shootings but released him. When authorities obtained a warrant for Sarmiento's arrest, they learned that he had gone to Mexico, where he remained until he returned to the United States and was arrested in May 2009. Sarmiento confessed to investigators that he shot Bettie, Lydia, and Jessica. The trial court automatically sentenced Sarmiento to life imprisonment upon his conviction for capital murder, and the jury assessed his punishment at life imprisonment for the attempted capital murder conviction.

### III. INVOCATION OF RIGHT TO COUNSEL

In his first point, Sarmiento argues that the trial court erred by admitting incriminating physical evidence that police obtained as a result of statements that Sarmiento made after he clearly invoked his right to counsel during custodial interrogation. Sarmiento also appears to contend that the trial court erred by allowing the State to question an investigator about statements that Sarmiento made during the interview but after he invoked his right to counsel.

When a suspect asks for a lawyer, interrogation must cease until counsel has been provided or the suspect initiates further communication with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885 (1981). But not every mention of a lawyer will invoke the right to the presence of counsel during questioning; the suspect must unambiguously request counsel. *Davis v.*

2

*United States*, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009). The test is objective: did the suspect sufficiently clearly articulate his desire to have counsel present such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 122 (2011). When reviewing alleged invocations of the right to counsel, we look to the totality of the circumstances surrounding the interrogation, as well as the alleged invocation, to determine whether a suspect's statement can be construed as an actual invocation of his right to counsel. *Dinkins v. State*, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995).

The record demonstrates that investigators located Sarmiento soon after the shootings occurred, transported him to the police department, and questioned him regarding his whereabouts that night. Investigators read Sarmiento his *Miranda* rights, and Sarmiento signed a card waiving those rights. During the questioning, Sarmiento consented to a search of his residence, and authorities later found a hooded sweatshirt that he had worn earlier in the night and that matched Lydia Walker's description of the clothing worn by the person responsible for the shootings. At trial, Texas Ranger Dwayne Dockery testified about an exchange that he had with Sarmiento during the interview regarding Sarmiento's mentioning an attorney:

> Q. Now, he did mention an attorney at one point, did he not?

3

A.    Yes, sir.

Q.    Tell the jury what he said.

A.    Well, at one point during the questioning, I asked the Defendant about obtaining a GSR test on him, which is a gunshot residue test.

And at that point he said that he might need to talk to an attorney before he did that.

Q.    All right.  Specifically, that test?

A.    Yes, sir.

Q.    Now, did you -- did you really want a gunshot residue sample from him?

A.    No, sir.

Q.    So why did you talk to him about it?

A.    I wanted to see what his response was going to be.

Q.    And why . . . were  you  not  really . . . interested . . . in doing that test at that point?

A.    Because I knew, based on my experience and training, that due to the amount of time that had lapsed since this offense had occurred, that we would not be able to get any results from that GS -- gunshot residue test.

Q.    All right.  So you just wanted to see how he reacted to it?

A.    Yes, sir.

Q.    And his response to you was, well, maybe I should talk to a lawyer before I do that?

4

A.    Correct.[2]

Sarmiento's statement that he "might" need to talk to an attorney or that he "maybe" should talk to a lawyer was not a clear and unambiguous request for counsel requiring the investigators' questioning to terminate. *See Davis*, 512 U.S. at 462, 114 S. Ct. at 2357 (holding that petitioner's remark—"Maybe I should talk to a lawyer"—was not a request for counsel); *Dinkins*, 894 S.W.2d at 351–52 (holding that appellant's statement—"Maybe I should talk to someone"— was not an invocation of right to counsel). At most, it was an ambiguous statement that he might want to speak to an attorney. The trial court did not err by permitting the State to question Ranger Dockery about Sarmiento's statements made throughout the entire interview on December 18, 2005.

Even if Sarmiento's statement could somehow be construed as an unambiguous request for counsel, (1) the State did not seek to admit the hooded sweatshirt, and nonetheless, (2) physical evidence discovered as a result of a statement made in violation of *Miranda*, or "fruit of the poisonous tree," must only be suppressed if the statement was made through actual police coercion. *See Baker v. State*, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997) ("We have held that where evidence obtained as a result of an interrogation has not been used, the appellate court need not entertain a complaint attacking admissibility of that evidence."); *id.* at 22–23 ("We hold that the *Tucker/Elstad* rule applies to the

---

[2]Sarmiento does not challenge Ranger Dockery's recollection of the conversation.

failure to scrupulously honor the invocation of *Miranda* rights. In the absence of actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the 'fruits' doctrine of *Wong Sun*."); *see also In re H.V.*, 252 S.W.3d 319, 327–29 (Tex. 2008) (explaining same). Sarmiento does not argue that he was coerced during the December 18, 2005 interview with investigators. Accordingly, we overrule Sarmiento's first point.

## IV. JURY INSTRUCTION

In his second point, Sarmiento argues that the trial court erred by failing to give an article 38.23(a) "specific" voluntariness instruction addressing statements made by Texas Ranger James Holland, "[i]nasmuch as [they] . . . might have been construed as bearing on [Sarmiento's] voluntariness to return to the United States, or to provide a statement to Ranger Holland after he arrived."

In our review of a jury charge, we first determine whether error occurred; if error did not occur, our analysis ends. *See Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *see also Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009).

In *Oursbourn v. State*, the court of criminal appeals thoroughly addressed the issue of jury instructions relevant to the voluntariness of a defendant's confession. 259 S.W.3d 159, 169–79 (Tex. Crim. App. 2008). The court explained that there are three types of instructions under Texas statutory law that relate to the taking of confessions: (1) a "general" article 38.22, section 6 voluntariness instruction; (2) a "general" article 38.22, section 7 warnings

6

instruction (referring to the warnings under article 38.22, sections 2 and 3); and (3) a "specific" article 38.23(a) exclusionary-rule instruction. *Id.* at 173; *see* Tex. Code Crim. Proc. Ann. art. 38.22, §§ 2, 3, 6 & 7, art. 38.23(a) (West 2005). Due process and *Miranda* claims—involving police overreaching and coercion—may warrant both "general" and "specific" voluntariness instructions, while Texas statutory involuntariness claims—which may implicate the defendant's state of mind—warrant only a "general" voluntariness instruction. *Oursbourn*, 259 S.W.3d at 174. A "specific" exclusionary-rule instruction concerning the making of a confession is warranted only when police activity involves inherently coercive practices like those set out in *Colorado v. Connelly*, 479 U.S. 157, 163 & n.1, 107 S. Ct. 515, 520 & n.1 (1986).[3] *Oursbourn*, 259 S.W.3d at 178. There are, however, three requirements to trigger an article 38.23(a) instruction: (1) the evidence heard by the jury must raise an issue of fact, (2) the evidence of fact must be affirmatively contested, and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary. *Id.* at 177. "This factual dispute can be raised only by affirmative evidence, not by mere cross-examination questions or argument." *Id.*

---

[3]The Court referenced the following as inherently coercive practices: "defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit"; "defendant, on medication, interrogated for over 18 hours without food or sleep"; "police officers held gun to the head of wounded confessant to extract confession"; "16 days of incommunicado interrogation in closed cell without windows, limited food, and coercive tactics." *Connelly*, 479 U.S. at 163 n.1, 107 S. Ct. at 520 n.1.

The trial court gave the jury a combined "general" article 38.22, section 6 and section 7 voluntariness instruction, which Sarmiento does not challenge, and stated as follows:

> The court has admitted into evidence before you the alleged oral statement of the defendant, and you are instructed that before you may consider the same for any purpose you must first believe from the evidence beyond a reasonable doubt that the same was freely and voluntarily made by the defendant without compulsion or persuasion and that prior thereto the defendant had been warned by the person to whom the statement was made that:

> (1) he had the right to remain silent and not make any statement at all and that any statement he made may be used against him at trial; and

> (2) any statement he made may be used as evidence against him in court; and

> (3) he had the right to have a lawyer present to advise him prior to and during any questioning; and

> (4) if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during any questioning; and

> (5) he had the right to terminate the interview at any time;

> and that the defendant prior to and during the making of the statement, knowingly, intelligently and voluntarily waived these rights; but if you do not so believe, or if you have a reasonable doubt thereof, then the alleged statement is entirely withdrawn from your consideration and you shall not give the same any force or effect whatever or consider it as any evidence of the defendant's guilt in this case, and you shall not consider any evidence obtained as a result thereof, if any.

But the trial court denied Sarmiento's requested "specific" article 38.23(a) instruction, which he set out as follows:

> You are instructed that under our law a confession or statement of a defendant is to be considered as valid evidence only if it appears that the same was freely and voluntarily made without compulsion, coercion or persuasion. So, if you find from the evidence in this case or if you have a reasonable doubt that prior to the giving of the statement by the defendant, if he did give one, *any officer threatened to cause the Defendant's family to be harm[ed]* or in any manner coerced the defendant or used any improper influence on the defendant, and the defendant, through fear or under duress or under any other improper influence was hereby induced to give or sign said statement, then such statement would not be freely made and voluntary, and in such case, you will wholly disregard the alleged confession or statement and not consider it for any purpose. Additionally, you will disregard and not consider for a[n]y purpose any evidence obtained directly or indirectly as a result of the involuntary statement or confession. [Emphasis added.]

Sarmiento states that this requested instruction "pointed to the facts in the trial that might have been found coercive by the jury." He contends,

> Ranger Holland admitted that he [appealed] to Appellant's emotions to get him to talk. Holland told Appellant on the telephone that there was a reward for his arrest while Appellant was in Mexico, that there were bounty hunters, and the Ranger had no control over those people. Ranger Holland told Appellant's family similar things in order to get Appellant to come back to the United States. [Record references omitted.]

Ranger Dockery testified that he turned his investigation over to Texas Ranger James Holland in 2008. Ranger Holland testified that his primary goal was to locate Sarmiento, interview him, and bring him back to the United States. For over a year and a half, Ranger Holland "tried multiple approaches to bring" Sarmiento back to the United States, including running Crime Stoppers

9

advertisements and contacting multiple government agencies. At some point, Ranger Holland made contact with Sarmiento's sister, who gave him a phone number to contact Sarmiento. Ranger Holland called the phone number and spoke to Sarmiento. Over the course of several conversations, Ranger Holland told Sarmiento that there were warrants out for his arrest, that he would be arrested once he entered the United States, and that he needed to return to the United States if he wanted to prove his innocence. Ranger Holland testified that as a trained interrogator, he employs different approaches when working with suspects and that in this case, "Sarmiento wanted to be coddled. And I stepped into that role as the caregiver; the mother, the father he never had; who was there to listen to him. You know, he was done wrong, and I needed to help him, and that's the role that I stepped into." Regarding rewards that had been offered for Sarmiento's return, Ranger Holland testified,

> I told him that there [were] rewards out for him. And that I had absolutely no control over Mexican authorities, over anyone who would answer these rewards in the paper; bounty hunters, road police officers, you know, federales. I had no control over who came after him and when they came after him.
>
> And I did tell him that, you know, the only concrete piece of information that we have about him is location, where his mother lives. And I said, you know, you really need to think about your family, and think about your mom, because these people are going to go [to] your mother. And they're going to, you know, set up surveillance. And they're going to pick her up time and time again until they locate you.

The following exchange then occurred on cross-examination:

Q. Okay. I'm just curious as to how you were able to convince [him] to -- to come back and walk across the bridge, so you could put him in jail?

What did you say to him?

A. Multiple conversations, but I don't know --

Like I said before, I don't really know that there was so much convincing going on. I think that he honestly wanted to come over here.

I was surprised.

Q. Did he tell you that he was concerned about the safety of his family?

A. Yes; he did.

Q. And did you say anything to him to make him be concerned about his family?

A. Did I say I was going to threaten his family?

No.

Q. No.

A. Did I say that I had control of people that would be looking for him in Mexico?

Q. Yeah.

A. I told him I had no control with anyone who worked in Mexico, the Mexican authorities, or any agents of the Mexican government.

Q. Did you tell him that there was -- there either was a reward, or there was going to be a reward put up for his return dead or alive?

A. No.

11

He -- He was told, and I'm sure that he was aware that there was a reward for his arrest.

Did I ever make the statement that it was dead or alive reward; no, I didn't.

Q. Did you tell him that you wouldn't be a bit surprised if the drug cartel down there, or some of their operatives might injure or kill his child and wife while they were looking for him?

A. No; I didn't say that.

There [were] comments made about who would be a bounty hunter, and who would look for him in situations like that. And he was -- it was described to him that I had no control of those people. And that there . . . was a monetary reward for his arrest.

Q. Did you --

You did make those comments, though, to him?

A. Exactly.

Q. You told him that you didn't have any control, and his family might get hurt if he didn't come back?

A. I made the comment that I had no control over the world that was out there. And I had no control over the people who may or may not locate him.

Q. But you don't see that as any type of coercion on the Defendant to come up there and say what you wanted him to say?

A. There's a reward for his arrest?

Q. No; I'm talking about the fact his wife and child might be killed or hurt.

A. I didn't tell him that his wife and child may be killed or hurt.

Could he have come to that conclusion on his own?

12

Yes.

Would that have been a legitimate conclusion?

Mexico is a rough place; it could have been.

Q.     The statements you made, was that your purpose for him to come to that conclusion?

A.     My purpose was for him to come back to the United States of his own free will.

The only witness who testified on behalf of Sarmiento was his sister.  She testified that Ranger Holland told her that there would be a reward for Sarmiento if he did not return to the United States, that the cartels in Mexico were "really bad right now," and that she was concerned for Sarmiento's safety because the cartels would "kill whoever they have to kill to get the money."

The record does not demonstrate that Ranger Holland implemented the type of coercive police tactics referenced in *Connelly* as part of his attempts to convince Sarmiento to return to the United States or to give a statement admitting guilt.  There is no fact issue, and indeed no evidence, that Ranger Holland—or someone at his insistence—threatened Sarmiento in any way.  Accordingly, we hold that the trial court did not err by denying Sarmiento's requested article 38.23(a) "specific" voluntariness instruction.  We overrule Sarmiento's second point.

## V. CONCLUSION

Having overruled both of Sarmiento's points, we affirm the trial court's judgments.

                                        BILL MEIER
                                        JUSTICE

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  May 3, 2012